Rene L. Valladares
Federal Public Defender
Nevada State Bar No. 11479
Erin Gettel
Assistant Federal Public Defender
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577
Erin_Gettel@fd.org

Attorney for Petitioners

# United States District Court

# District of Nevada

| | |
|---|---|
| Jess Elijio Carranza, Jimmy Carter Kim,<br><br>          Plaintiffs/Petitioners,[1]<br><br>     v.<br><br>Brian Koehn, Warden, Nevada Southern Detention Center,<br><br>          Defendant/Respondent. | Case No. 2:20-cv-1586<br><br>Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Complaint for Declaratory and Injunctive Relief |

 "It has long been said that a society's worth can be judged by taking stock of its prisons.  That is all the truer in this pandemic, where inmates everywhere are rendered vulnerable and often powerless to protect themselves from harm."[2]

---

[1] Both petitioners are charged in criminal cases in this district in which they are represented by the Federal Public Defender's Office.

[2] *Valentine v. Collier*, 140 S. Ct. 1598, 1601 (May 14, 2020) (statement of Sotomayor, J., joined by Ginsburg, J.).

## Introduction

COVID-19 is an ongoing, once-in-a-century public health crisis that needs little introduction. The disease has spread rapidly throughout the world, and particularly jails and prisons. By mid-June, the five largest clusters of COVID-19 in this country were inside correctional institutions.[3] In the previous month, the number of known infected incarcerated individuals doubled and prison deaths increased by 73%.[4] A recent study confirmed that in prisons and jails, COVID-19 not only spreads more rapidly, but is also more deadly: Prisoners are 5.5 times more likely to contract the virus than the general U.S. population and 3 times more likely to die from it.[5]

The Federal Bureau of Prisons is no exception. As of this filing, COVID-19 has expanded its foothold to 109 BOP facilities.[6] Eleven thousand nine hundred and four BOP inmates have contracted the disease—roughly 10.7% of the BOP prison population.[7] One hundred and sixteen have died.[8] These numbers do not include privately managed prisons contracted by the BOP, or those in the custody of the United States Marshals Service (USMS).

---

[3] Timothy Williams, *et al.*, *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*, June 16, 2020, *available at* https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html.

[4] *Id.*

[5] The Journal of the American Medical Association, "*COVID-19 Cases and Deaths in Federal and State Prisons*, July 8, 2020, *available at* https://jamanetwork.com/journals/jama/article-abstract/2768249 (concluding that inmates are 5.5 times more likely to contract the virus than the general U.S. population and 3 times more likely to die from the disease).

[6] https://www.bop.gov/coronavirus/ (last accessed August 26, 2020).

[7] *Id.*

[8] *Id.*

2

The USMS does not own or operate detention facilities but houses prisoners in state or local facilities, BOP facilities, and private detention facilities. The USMS is responsible for approximately 57,000 prisoners each day through contracts (or, in the case of state and local facilities, intergovernmental agreements) with roughly 750 facilities.[9] The subject of this litigation is Nevada Southern Detention Center (NSDC), a private facility owned by CoreCivic[10] and contracted by the USMS. NSDC primarily houses pretrial detainees, but also houses sentenced prisoners, prisoners in-transit between BOP facilities across the country, and ICE detainees.

## Parties

Petitioner Jess Elijio Carranza is a pretrial detainee at NSDC, charged in Case No. 2:19-cr-00310-RFB-BNW. His jury trial is currently scheduled for October 19, 2020. Petitioner Carranza has been exposed to COVID-19 and has experienced symptoms but has not been tested despite numerous requests. Carranza suffers from type 1 diabetes and high blood pressure, which the Centers for Disease Control (CDC) recognizes may increase the risk of severe illness from COVID-19.[11]

Petitioner Jimmy Carter Kim is a pretrial detainee at NSDC, charged by complaint in Case No. 2:18-mj-00836-DJA. His preliminary hearing is currently scheduled for October 16, 2020. Petitioner Kim has been exposed to COVID-19 and was confirmed positive. After completing a 14-day medical isolation period, Kim was returned to his dormitory style unit but not retested.

---

[9] https://www.documentcloud.org/documents/7033924-U-S-Marshals-Response-to-Vice-Inquiries-on-Covid.html (last accessed August 18, 2020).

[10] Previously the Corrections Corporation of America.

[11] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last accessed August 25, 2020).

Respondent Brian Koehn is the Warden of NSDC. He is named in his official capacity as Petitioners' immediate custodian.

### Jurisdiction and Venue

This Court has subject-matter jurisdiction over this petition under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 2241 (habeas corpus), as Carranza and Kim are held in violation of the Fifth Amendment to the U.S. Constitution.

The District of Nevada is the proper venue because a substantial part of the events and omissions giving rise to these claims occurred and continue to occur in this district.

### Statement of Facts

**I.  COVID-19**

1.    As of this filing, there are 5,752,653 total COVID-19 cases and 177,59 deaths in the United States. Nevada has 66,680 reported cases and 1,259 deaths.[12]

2.    Although older adults and people who have severe underlying medical conditions seem to be at higher risk for developing more serious complications from COVID-19 illness, anyone can have severe symptoms.[13]

3.    There is currently no vaccine to prevent COVID-19.[14]

4.    According to the CDC, the best way to prevent illness is to avoid being exposed to the virus.[15]

---

[12] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed August 26, 2020).

[13] https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last accessed August 26, 2020).

[14] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last accessed August 26, 2020).

[15] *Id.*

5.      The virus spreads mainly from person-to-person through respiratory droplets produced when an infected person coughs, sneezes, or talks.[16]

6.      Some recent studies have suggested that COVID-19 may be spread by people who are not showing symptoms.[17]

7.      To avoid spread, the CDC recommends: washing hands with soap and water or using a hand sanitizer that contains at least 60% alcohol;[18] maintaining six feet of distance between yourself and those outside your household; wearing a mask, though it cautions that this is *not* a substitute for social distancing; and cleaning "AND" disinfecting frequently touched surfaces daily.[19]

## II.   COVID-19 in jails and prisons

The CDC has recognized the unique challenges COVID-19 poses in correctional and detention settings, including:[20]

8.      Detainees live within congregate environments, heightening the potential for the virus to spread once introduced.

9.      Some settings, particularly jails and detention centers, have high turnover, admitting new entrants from a variety of locations daily who may have been exposed to the virus.

10.     The ability of detainees to practice disease-prevention measures and social distancing may be limited and is determined by the supplies provided in the facility as well as security and space considerations.

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] This is summarized from the full list *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last accessed August 18, 2020).

11.     Detainees may hesitate to report symptoms of COVID-19 or to seek medical care due to stigma and fear of isolation.

12.     Because limited outside information is available to many detainees, unease and misinformation about COVID-19 may be high.

13.     Attached as Exhibit 1 is a declaration by Karla D. Magner, PhD, an Associate Professor in the School of Community Health Sciences at the University of Nevada, Reno.  Dr. Wagner explains that incarcerated individuals are subject to increased risk from COVID-19 and that prophylactic precautions and widespread screening/detection are critical.  She recommends reducing the inmate population; universal testing; sufficient space for social distancing; monitoring for symptoms; rapid testing and isolation of suspected cases; contract tracing; and access to soap, water, and hand sanitizer.  She further recommends that precautions be taken to ensure that these measures do not result in deterioration of conditions for detainees or interfere with their ability to access information or communicate with people outside the facility.

14.     Attached as Exhibit 2 is a declaration by Brie Williams, MD, MS, an associate professor of medicine at University of California, San Francisco (UCSF) School of Medicine.  Dr. Williams further explains the heightened risk COVID-19 poses to incarcerated people.  She recommends universal testing; halting new admissions or, if not possible, quarantining all new arrivals for 14 days; enhancing inmates' communication with friends and family outside of prison while temporarily eliminating in-person contacts; reducing the inmate population; and ensuring inmates and staff have a comprehensive understanding of COVID-19 policies and practices.

## III.   Conditions at NSDC

The Federal Public Defender for the District of Nevada (FPD) represents the vast majority of pretrial detainees at NSDC in their criminal cases.  This petition is

primarily based on information relayed by FPD clients to FPD employees,[21] but also includes information gleaned from court proceeding, court filings, and informal testing reports provided by the USMS.

The NSDC increases the risk of infection for detainees in a number of ways, including by: failing to test all current inmates for COVID-19; failing to test even symptomatic detainees; failing to re-test positive detainees before deeming them "cleared;" failing to test staff and encouraging staff to work, even if symptomatic; failing to provide sufficient cleaning supplies, properly sanitize common spaces, and provide proper personal protective equipment (and enforce its use); placing COVID-19 positive detainees in "the hole," where they are denied basic necessities, which discourages reporting symptoms; moving detainees and staff between quarantined and non-quarantined units; and, until very recently, failing to test and properly quarantine all newly arriving inmates.

Detainees are also being denied access to programming; communication with their attorneys, other professionals, families, and friends; outside medical services; and public safety information. One result is a more tense environment for detainees and staff, making violence more likely. Due to lack of transparency and inadequate testing, the true number of COVID-19 cases at NSDC is unknown. Due to lack of proper prevention and detection, Petitioners have been exposed to COVID-19 and they are subjected to more restrictive conditions of confinement as units constantly cycle in and out of quarantine/cohort status and individuals in and out of medical isolation. Below is a summary of current conditions at NSDC as relevant to this petition.

---

[21] Exhibit A (Declaration of FPD Investigator Michele Blackwill).

### A.    Lack of COVID-19 Testing

15.    Detainees are denied testing for the virus, even where symptomatic, including head, muscle, and body aches, loss of taste or smell, and chills.[22]

16.    NSDC will not test detainees unless they meet a certain temperature threshold regardless of other symptoms.  This was previously reported as 102 degrees and, more recently, 100.4 degrees.

17.    On August 12, 2020, a detainee reported that he had just been released from quarantine—where he had been placed after exhibiting symptoms *but without being tested*.  This detainee was also not tested before being returned to general population.

18.    Detainees who are tested must remain in their assigned units while test results are pending, which typically takes a few days.  For example, in early July 2020, Petitioner Kim was permitted to remain in his dorm unit (Unit G4) for two days while his test was pending and was only removed after it returned positive.

19.    Petitioner Carranza was housed in Unit G4 when Kim remained in the unit while his test was pending.  During this time, Carranza suffered symptoms including head and body aches, shortness of breath, and dry cough.  He repeatedly requested testing but was denied because he did not have a fever of at least 100.4 degrees.

20.    Numerous detainees in Unit G4 fell ill and requested testing during this time but were denied.

---

[22] The CDC has identified the following as possible symptoms for COVID-19: fever or chills; cough; shortness of breath or difficulty breathing; fatigue; muscle or body aches; headache; new loss of taste or smell; sore throat; congestion or runny nose; nausea or vomiting; diarrhea.  https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last accessed August 18, 2020).

**B.      Disciplinary Measures Rather than Treatment for COVID-19
         Positive Detainees**

21.      Detainees are placed in the "the hole" after testing positive (or as
described in ¶ 17, NSDC suspects they are positive but deliberately avoids testing
them in order to avoid reporting the detainee as positive).

22.      In early July, Kim collapsed on the floor in the medical wing after
finally being removed from his unit after his COVID-19 test returned positive.
Kim's symptoms included fever, chest pains, dry mouth, fatigue, head and body
aches, difficulty breathing, stiff joints, lock jaw, and his arms and hands were
seizing up.  NSDC staff picked him up off the floor, placed him in a wheelchair,
handcuffed him, and wheeled him to the hole.  Staff did not give Kim any medicine
to treat his symptoms, let alone schedule an appointment with a doctor before
placing him in the hole.

23.      The cell in which Kim was placed was filthy; he had no bedding for five
hours and no soap until the next day.  He was not given medicine to ease his
symptoms before being placed in the hole and was forced to drink water out of the
sink.

24.      Kim was not permitted access to a phone to call his attorney for five
days.  Additionally, he was not permitted to take a shower for seven days.

25.      After 14 days, Kim was moved from the hole back to his unit.  He was
never retested.

26.      While quarantined in the hole, COVID-19 positive individuals do not
have access to the recreation room, law library, phones/email, or yard.

27.      Even when in the hole for medical rather than disciplinary reasons,
detainees are handcuffed any time they leave the cell, including immediately before
and after entering the shower.

28.     Some detainees hesitate to report symptoms to avoid being placed in the hole.

29.     The only treatment offered is Tylenol/Ibuprofen.

**C.     Inadequate Screening and Quarantining of Detainees and Staff**

30.     Until August 20, 2020, new individuals arriving at the facility were not tested for COVID-19 and were not quarantined for 14 days before being placed in general population.

31.     As described above, even symptomatic detainees remain in their units pending test results.

32.     COVID-19 positive individuals are not retested before being placed back into their units, nor are they consistently quarantined for 14 days after testing positive.

33.     On June 9, 2020, G2 Unit Manager Sapp told detainees "it is what it is" in response to their protests that they had been exposed to a newly arrived infected individual who was not quarantined properly.

34.     On June 10, 2020, multiple G2 Unit detainees told Sapp that they would report the above exposure to their attorneys.  Sapp told them "I hope you have a good lawyer.  I'll be waiting for your lawsuit.  Good luck with that."

35.     Correctional officers move between quarantined, high risk, and non-quarantined units.  So do medical staff.  Staff do not always change their gloves and wipe down equipment between units.

36.     C.O. Sample reported symptoms.  NSDC denied testing, and still came to work.  He disappeared for a week or two, and, when he returned, indicated that he sought out testing on his own and was indeed COVID-19 positive.  It is unclear whether NSDC required him to provide a negative test before returning to work.  Several other staff members told detainees that they were sick but were threatened with write-ups if they did not come to work.

37.     A detainee overheard a nurse say: "It's bullshit what they are doing to you guys and what you all have to go through with the outbreak in housing G2 [Unit]."

38.     During the week of August 17th, the FPD Office received numerous reports that COVID-19 high-risk clients (those with underlying medical conditions) being housed in protective custody were given an ultimatum: sign a waiver agreeing to be housed with general population, COVID-19 high-risk inmates or be placed in the hole.

### D.     Inadequate Personal Protective Equipment (PPE), Cleaning Supplies, Sanitation Practices, and Social Distancing

39.     Detainees report that units are sprayed with disinfectant at night but that the disinfectant is watered down and wiped up without being allowed to sit for the necessary amount of time.

40.     At least one detainee reported watching a COVID-19 positive detainee being removed from his unit and his bunk not being sanitized after.  Other detainees washed it with soap and water.

41.     Though detainees have now been issued masks, they are not required to wear them while in their units, and NSDC staff are inconsistent with proper mask use.

42.     The NSDC does not issue hand sanitizer or disinfectant wipes, nor are these items available for purchase in commissary.

43.     The only personal hygiene items NSDC provides is bar soap and liquid soap in the bathroom, which is often empty.

44.     There is no protocol for regular, facility-sponsored mask cleaning. Many detainees have been using the same mask for months.  Some report washing their own, sending out with regular laundry, or asking a case manager to use an "iron" to "clean" it.

11

45.    Detainees housed in dorm-style housing units report that social distancing is impossible as these units are full or near-full and the bunk beds are only a few feet apart.

46.    Phones and computers are not cleaned between use, and there are no cleaning products available to do so.  Detainees wipe the phone with shirt sleeves or towels.

47.    Unit porters (detainees) are responsible for cleaning the bathrooms, not staff.  The quality of the cleaning is uneven.

**E.    Lack of Access to Friends and Family, Programming, and Exercise**

48.    Video visits at the facility remain suspended, so detainee access to outside friends and family has greatly decreased and become significantly more expensive.

49.    Detainees are only given one free phone call (maximum of 20 minutes) per week, and access is further limited due to long lines, inability to clean phones between use, and cost.[23]  For example, there are only five working phones in the G4 Unit, which houses around 90 people.  These phones must be shared between those placing legal as well as personal calls.

50.    Access to computers is also extremely limited due to long lines and lack of cleaning supplies.  For example, the G4 Unit has 2 working computers and it costs $.04/minute to use the inmate e-mail system.

51.    Detainees are permitted outdoors only in a caged-in cement area about half the size of a basketball court.

52.    Detainees in non-dormitory units, like Unit AA, are kept in their cells 23 hours per day.

---

[23] A 20-minute phone call costs $4.10.

53.     When dormitory units are placed on quarantine (typically after a detainee inside tests positive), they are not permitted to go to medical, church, or the recreation/program room.  Units remain in a more-restrictive quarantine state, and must continually return to it, due to NSDC's failure to properly test for and contain the virus.

54.     Most, if not all, rehabilitative programming is suspended.

**F.     Lack of Access to Medical Care**

55.     Detainees do not have adequate access to outside medical services.

56.     For example, one detainee's appointment to have an infected tooth extracted has been repeatedly cancelled, as was another's x-ray appointment.  A female detainee's appointment for an MRI and surgical referral was repeatedly canceled despite a breast mass and discharge.

57.     Medical kites are not answered for several days and sometimes not for up to one–two weeks, and requests for testing or treatment are denied.

58.     The only way to get medical attention in a quarantined unit is to "man down."

59.     When COVID-19 positive (or suspected positive) detainees are removed from their units, they are placed in cells designated for disciplinary housing, where they are watched by correctional staff rather than medical staff.

60.     NSDC is located in Pahrump, Nevada, which has a population of approximately 36,400.  A COVID-19 outbreak would exceed the capacity of the local health infrastructure because treatment for serious cases requires significant medical intervention, including ventilator assistance and intensive care support.

**G.     Lack of Access to Public Safety Information**

61.     Due to lack of testing, the true number of COVID-19 cases at NSDC is unknown.  Since limited testing began, there has consistently been positive cases at the facility.

62.    Detainees do not receive accurate and up-to-date information about the number of cases and COVID-19 protocols.

63.    Each Monday, NSDC, through the USMS, sends the FPD office a list of current positive, pending, and negative tests.  This list includes only FPD clients.  A positive result is considered "cleared" and no longer positive for reporting purposes once the detainee finishes the medical-isolation period.  However, there is no new testing.

64.    As of August 12, 2020, NSDC reported one positive, two negatives, one pending, and one "cleared" FPD client.

65.    Detainees have been told by NSDC staff that they will not be tested unless they have a cough and a temperature of at least 100.4 degrees, unless directed by USMS or ICE.  But when detainees complain about the lack of testing to USMS, they are told that USMS cannot direct NSDC who to test.

66.    At an April 30, 2020, evidentiary hearing in *U.S. v. David Cox*, 2:19-cr-271-RFB-VCF, NSDC Warden Brian Kohen testified that the facility has as many nasal tests as needed but that NSDC must receive permission from the USMS in order to administer a test.

67.    On May 27, 2020, Chief Unit Manager Sapp informed the G2 Unit population that at least 60 to 70% of them had asymptomatic COVID-19 and that if they did not have more than 2 or 3 symptoms, including fever, they would not be tested.

68.    In May, the Deputy Warden informed the detainees that NSDC had ceased movement of inmates between facilities because of COVID-19 concerns.  But NSDC now states they cannot cease movement because they have contracts to fulfill.

69.     On one Friday in June, the Assistant Warden told G2 Unit detainees they would be tested the next week.  She never returned to the Unit, and the promised unit-wide testing never occurred.

70.     As described in ¶ 17, it appears NSDC is deliberately avoiding testing symptomatic individuals—even those it so strongly suspects are positive that they require placement in medical isolation—to avoid reporting positive tests.

71.     At the above-referenced evidentiary hearing in *Cox*, 2:19-cr-271-RFB-VCF, NSDC Warden Brian Kohen also testified that each pod (unit) has its own ventilation system, including Unit BB, which is the unit used to house medically vulnerable detainees.

72.     In late July or early August, NSDC staff deployed pepper spray in Unit BA.  Unaware that Unit BA had been sprayed, detainees in Unit BB began coughing and sneezing.  One detainee who had previously been exposed to pepper spray immediately recognized it.  He believes that the chemical came through ventilation in a wall shared by Units BA and BB.  When BB detainees asked about the spray, the C.O.s said that there had been lots of problems in Unit BA, which must have led to the unit being pepper sprayed.

73.     That pepper spray deployed in Unit BA infiltrated Unit BB suggests that the units do not have entirely separate ventilation systems and that the virus, like the pepper spray, could also be spread between quarantined/infected and uninfected units through the ventilation system and, specifically, into Unit BB, the medically vulnerable unit.  It also shows a lack of transparency on the part of NSDC.

74.     Detainees in Unit AA have prepared a working affidavit describing conditions at NSDC, one of which has 56 signatures.  NSDC staff refuse to notarize the document, which further shows a lack of transparency on the part of NSDC and an active attempt to conceal the true nature of conditions there.

### Statement of Law

A federal district court is authorized to grant a writ of habeas corpus under 28 U.S.C. § 2241 where a petitioner is "in custody under or by color of the authority of the United States . . . in violation of the Constitution or laws or treaties of the United States.[24]  The Supreme Court has left open whether detainees challenging "large-scale policy decisions concerning the conditions of confinement imposed . . . might be able to challenge their confinement conditions via a petition for writ of habeas corpus."[25]  Aside from § 2241, this Court has jurisdiction under 28 U.S.C. § 1331, as an equitable cause of action under the Constitution.[26]  The Ninth Circuit has recognized an equitable cause of action to enjoin unconstitutional official conduct.[27]  Sections 2201–02 of Title 28 of the United States Code further provide

---

[24] 28 U.S.C. §§ 2241(c)(1), (3).

[25] *Ziglar v. Abassi*, 137 S.Ct. 1843, 1862 (2017); *Boumediene v. Bush*, 553 U.S. 723, 792 (2008).  *See Bell v. Wolfish*, 441 U.S. 520, 526, n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement"); *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal").

A divided en banc panel of the Ninth Circuit held that "when a prisoner's claim would not necessarily spell speedier release, that claim does not lie at 'the core of habeas corpus.'"  *Nettles v. Ground*, 830 F.3d 922, 930 (9th Cir. 2016) (internal citation and quotation marks omitted).  In a footnote, the Ninth Circuit observed that its ruling did not apply to federal prisoners; the Supreme Court had yet to address the issue and federal prisoners had resorted to *Bivens*, not to § 1983.  *Id.* at 931 n.6.

[26] *See Ziglar*, 137 S. Ct. at 1865 (observing that alien detainees challenging their conditions of confinement could seek "an injunction requiring the warden to bring his prison into compliance with the regulations discussed above [C.F.R.s] or some other form of equitable relief").

[27] *Sierra Club. v. Trump*, 929 F.3d 670, 695 (9th Cir. 2019) (recognizing equitable cause of action to enforce Appropriations Clause notwithstanding that plaintiffs also had cause of action under the Administrative Procedure Act).

that a court may, upon the filing of an appropriate pleading, declare the rights and other legal relations of any party seeking such declaration.

The Due Process Clause of the Fifth Amendment forbids the government from depriving a person of life, liberty, or property without due process of law.[28] Pretrial detainees have a Constitutional right to be free from punishment prior to conviction,[29] which includes a right to reasonable safety and medical care.[30]  A prison official violates these rights when he acts with "deliberate indifference" to detainees' safety or serious medical needs.[31]  Unlike convicted prisoners, whose claims arise under the Eighth Amendment, and therefore require a showing of both subjective and objective deliberate indifference, pretrial detainees need only show "objective recklessness" by jail officials.[32]  "Objective recklessness" means that the jail official "did not take reasonable available measures to abate [a substantial risk of harm facing petitioners], even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the [the jail official's] conduct obvious."[33]

### Claim for Relief

**Fifth Amendment violations for Deliberate indifference to Petitioners' safety and serious medical needs (28 U.S.C. § 2241, 28 U.S.C. § 1331, and 28 §§ U.S.C. 2201–02)**

---

[28] U.S. Const. amend. V.

[29] *See Bell v. Wolfish*, 441 U.S. 520, 99 (1979) ("holding that, under Due Process Clause, a detainee may not be punished prior conviction").

[30] *Gordon v County of Orange*, 888 F.3d 118, 1124–25 (9th Cir. 2018).

[31] *Id.*; *Castro v. Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc).

[32] *Castro*, 833 F.3d at 1071.

[33] *Id.*

Petitioners incorporate and re-allege ¶¶ 1–74 above and allege Respondent is holding them in violation of the Constitution by subjecting them to unlawful pre-trial detention amounting to punishment by acting in deliberate indifference to their health and safety.  Despite the well-known heightened risk of transmission of, and serious illness from, COVID-19 in detention facilities, Respondent has intentionally failed to implement reasonable policies and practices to abate those risks.  As a result, Petitioners have been exposed to the virus and remain at constant risk of reemergence of symptoms or secondary infection, placement in the hole, and denial of access to treatment and basic necessities.  Petitioners are also subject to more restrictive conditions of confinement than they would otherwise be because the facility must continually quarantine/cohort and un-quarantine affected units and individuals.  The environment at NSDC is also more tense and the threat of violence is ever present due to the lack of public-safety information and the inconsistent information detainees have received about testing and known infections.

### Prayer for Relief

Petitioners respectfully request that this Court:

1.      Appoint an expert under Federal Rule of Evidence 706 to conduct an independent site visit at NSDC and to make recommendations to the Court about best practices for containing the spread of COVID-19 at the facility, quarantine/cohort units, and treatment and placement of infected individuals.

2.      Grant this Writ and/or an Order under 28 U.S.C. § 1331, 28 U.S.C. §§ 2201–02, and Federal Rules of Civil Procedure 57 and 65 declaring the current conditions at NSDC unconstitutional and requiring Respondent to:

a.      Ensure that detainees can remain six feet apart to practice social distancing in compliance with CDC Guidance;

18

b.     Ensure that detainees have access to hand sanitizer containing at least 60% alcohol;

c.     Ensure that detainees have daily access to showers and clean laundry, including personal towels and wash rags after each shower;

d.     Require that all NSDC staff wear PPE consistent with CDC Guidance, including masks and gloves, when interacting with detainees;

e.     Provide an anonymous mechanism for detainees and NSDC staff to report their concerns regarding COVID-19 directly to the USMS and the Court;

f.     Conduct immediate testing for anyone displaying or reporting any symptom of COVID-19, as identified by the CDC, or who has been exposed to someone displaying or reporting symptoms; to any detainee or staff member who desires a test; and to any newly arriving detainees.

g.     Implement a facility sponsored process for adequate mask cleaning and ensure that each detainee has two masks;

h.     Ensure that COVID-19 positive individuals are properly quarantined in a non-punitive setting, with continued access to showers, recreation, mental health services, reading materials, commissary, phone and video visitation with loved ones, communication with counsel, and personal property;

i.     Clean and disinfect frequently touched surfaces with disinfectant products effective against the virus that causes COVID-19 (at the manufacturers recommended concentration), as well as surfaces in

common areas, every two hours during waking hours, and at least once during the night;

j.   Provide detainees with sufficient and effective cleaning supplies free of charge so that they can clean frequently touched items, such as phones, before use;

k.   Update detainees and the FPD weekly about all current positive and outstanding tests, and do not deem a positive individual "cleared" until he has tested negative;

l.   Respond to all medical kites within 12 hours and ensure that detainees have access to routine medical care;

m.   Respond to all emergency (as defined by the medical community) requests for medical attention within one hour;

n.   Provide free testing to NSDC staff, screen staff for symptoms at the beginning of each shift, and require testing for symptomatic staff;

o.   Maintain separate units for those who are at high risk for severe complications from COVID-19 with continued separation for those in need of protective custody;

p.   Provide no less than one phone for every ten detainees and 500 free phone minutes per week;[34]

q.   Appoint an independent site inspector who can conduct unannounced inspections at NSDC to ensure compliance with this Court's order.  This individual should also be given access to all internal surveillance;

---

[34] Because in-person visits are suspended, the BOP has made all calls free of charge and increased the phone limit to 500 minutes per month. https://www.bop.gov/coronavirus/covid19_status.jsp (Last accessed August 25, 2020).

r.    If Constitutional conditions of confinement cannot be established, order Petitioners' released pending trial; and

s.    Grant any further relief this Court deems appropriate.

Further, as an interim measure if the writ cannot be immediately granted, Petitioners seek:

75.    Court-mandated and supervised fact-finding of the actual conditions at NSDC.  A district court granted a similar request in *Stirling v. Salazar*, 3:20-cv-00712, ECF No. 24 (D. Or. 2020).[35]  *See also In re Coronavirus/COVID-19 Pandemic*, Administrative Order No. 2020-14 (E.D.N.Y. Apr. 2, 2020);[36] *Gomes v. Department of Homeland Security*, 20-cv-453, ECF No. 123 at 56–61 (D.N.H. May 14, 2020);[37] *Urdaneta v. Keeton*, 20-cv-654, ECF No. 52 at 22 (D. Ariz. May 11,

---

[35] The Court granted partial interim relief requiring respondent to provide the court and FPD with the following information within two days: (1) current protocols for screening and testing for COVID-19; (2) the number of inmates at the facility who have been tested and the number of positive tests; (3) number of staff and correctional ; (4) all efforts currently undertaken at the facility to slow the spread of COVID-19.  The Court defined protocols as including, but not limited to: (a) the specific type of COVID-19 test being employed; (b) the typical or average time the facility must wait to receive results; (c) the criteria for determining who will be tested, when they will be tested, and what frequency and under what circumstances tests will be re-administered, including persons who have tested negative.

[36] The General order requires bi-monthly status updates for detention facilities housing defendants in cases filed within the district, including regarding (1) protocols for screening and testing inmates, staff, and others entering or leaving each facility; (2) the number of inmates tested and the number of positive tests; (3) the number of staff and other correctional workers testing positive; and (4) "[a]ll efforts undertaken to mitigate the spread of COVID-19." *Available at* https://bit.ly/3l6zP9F.

[37] The Court ordered a report concerning detailed issues related to testing and mitigation measures in local jail holding federal detainees.

2020).[38]  Due to the lack of transparency and testing at NSDC, court-supervised fact-finding is appropriate here.

Dated August 26, 2020.

Respectfully submitted,

Rene L. Valladares
Federal Public Defender

*/s/ Erin Gettel*

Erin Gettel
Assistant Federal Public Defender

---

[38].  This Order solicited proposed measures from parties to ensure adequate health standards in a federal detention facility including placement in single-occupancy cell, meals delivered to cell, free, unlimited PPE, hygiene supplies, and disinfectant, requiring all staff to wear PPE, and requiring testing.