# EXHIBIT 1

# EXHIBIT 2

### DECLARATION OF BRIE WILLIAMS, MD, MS

I, Dr. Brie Williams, hereby declare as follows:

1. I am a professor of medicine at University of California, San Francisco (UCSF) School of Medicine. I attended the Icahn School of Medicine at Mount Sinai School of Medicine. I have an MS in community medicine from the Icahn School of Medicine. I completed my residency, geriatric fellowship and training in aging research at UCSF.

2. I am a Professor of Medicine in the UCSF Division of Geriatrics, Director of the Criminal Justice & Health Program at UCSF and Director of Amend: Changing Correctional Culture.

3. My work focuses on bringing the science of internal medicine, geriatrics and palliative care to address health-oriented challenges in criminal justice reform.

4. I collaborate with colleagues from diverse disciplines (including criminal justice, public safety and the law) to conduct impact-oriented research and education aimed at improving the health of all who live or work in U.S. correctional facilities.

5. I was contacted on April 28, 2020, by the Federal Public Defender for the District of Nevada regarding lack of widespread COVID-19 testing in correctional facilities in the state of Nevada and best practices in correctional facilities with respect to COVID-19 particularly with respect to testing.

6. Jails and prisons are the new foci of the COVID-19 epidemic in the U.S. In mid-March the first COVID-19 cases in correctional settings emerged in New York City, New York; Cook County, Illinois; and the Federal Bureau of Prisons. Today, ten of the top fifteen clusters of COVID-19 cases in the U.S. are in jails or prisons (spread across seven states) with nearly 17,564 known cases among incarcerated people (not including correctional staff which number at least 6,195), two-thirds of which were counted in the past week. Nearly half of the nation's 218 deaths among incarcerated people also occurred in the past week.

7. While information regarding staff and COVID-19 is more difficult to gather, at least 15 correctional officer deaths have been reported. The extent of the epidemic inside U.S. jails and prisons is unknown – including in the three

biggest systems. Last week's surge of cases captures growth mostly in a small number of states (OH, MI, NC) that began widescale testing in response to rapidly worsening epidemics. The nation's three most populous state prison systems (Florida, California, and Texas), housing nearly 25% of all state prisoners, have only tested less than 1% of their residents.

8. What is known about the extent of the outbreak in the nation's jails and prisons is worryingly similar to the epidemic's early (and ongoing) sweep through nursing homes. "Ground zero" for the COVID-19 outbreak in the U.S. was in a nursing home in Kirkland, Washington that saw a surge in respiratory illness in late February and reported its first positive test on February 28. By the end of March, 33% of the Kirkland facility's population had died of the disease and infections had been found in 400 additional facilities around the country.

9. As of April 27, 2020, updated data show 50,000 cases in at least 4,000 long-term care facilities spread across 36 states having already resulted in more than 10,000 deaths (residents and staff). While correctional settings and nursing homes differ in a number of ways, they share a critical feature: they are congregate living environments.

10. Of the nation's top twenty-five clusters of COVID-19 cases, all but three are congregate living environments (jails and prisons, nursing and veteran's homes, and the U.S.S. Theodore Roosevelt) – and the three that are not living environments are meat-packing plants where workers spend long shifts clustered close to one another in small, poorly ventilated space.

11. This mounting evidence that jails and prisons are at uniquely heightened risk of a rapidly worsening COVID-19 epidemic is supported by recently released case studies showing how easily the virus can be transmitted in comparable environments in which people spend prolonged time in close proximity to one another.

12. The figures below, for example, describe the trajectory of an outbreak on a single floor of a call center in South Korea over a two-week period, illustrating that COVID-19 "can be exceptionally contagious in crowded… settings" (in this case, a 43.5% attack rate). Figure 1, at left, shows the rapid increase in infection within 12 days of an initial infection. Blue shading in the figure at right indicates seating places of confirmed cases.



Figure 1. Epidemic curve of a coronavirus disease outbreak in a call center, by date of symptom onset, Seoul, Korea, 2020. Asymptomatic cases are excluded.

13. The evidence increasingly points to a rapidly worsening COVID-19 epidemic in U.S. jails and prisons, affecting residents and staff alike.

14. On March 23, 2020, Amend at UCSF issued guidance to correctional system leaders preparing for a potential COVID-19 outbreak in their facilities. That guidance emphasized the following critical steps:

15. Prioritize robust testing and contact tracing in correctional facilities. Rapidly scale up local testing in response to suspected or confirmed cases. It is impossible to know if there are positive cases, or how many, without testing.

16. Emerging evidence from correctional settings suggests that, like in nursing homes, initial suspected or confirmed cases often represent the "tip of the iceberg" of infection. When universal testing was prompted in two Ohio prisons by an apparent surge of infection, it revealed infection rates of 78% and 75% among residents and over 225 staff infections (one of which has resulted in a staff death).

17. This emerging pattern roughly corresponds to trends in nursing homes, where testing has been slow to keep up with the rapidly rising rates of infection, hospitalization, and death. In response, on April 2, all long-term care facilities were required to implement regular symptom screening for all, including daily temperature checks for residents. As of April 19, U.S. nursing homes are required to report cases directly to CDC and inform residents and their families or representatives of COVID-19 cases in their facilities.

18. Outside of a few correctional systems that have ramped up testing in recent days, screening and testing in U.S. jails and prisons appear poised to trail the pace of infection, giving up a vital infection control opportunity.

19. Existing guidelines on isolation and quarantine of known cases do little good if there are untested (potentially asymptomatic) infected people transmitting the virus in the general population. Because a high proportion of infected persons, especially in young populations, have no or mild symptoms, it is especially important to assume that when symptomatic people are identified as infected with SARS-COV-2 that there are other infected people in the population.

20. As testing capacity increases, jails and prisons should be prioritized for testing, including universal testing where infections (resident or staff) have already been identified or in those facilities located in communities with a high burden of community infection.

21. In addition to universal testing it is necessary to restrict all non-essential movement in and out of facilities, including halting new admissions when possible. If not possible, new admissions should be quarantined for two weeks with as few people housed per cell as possible prior to being introduced into the prison population.

22. Greatly enhance resident communication with friends and family outside of prison while temporarily eliminating in-person contacts.

23. In facilities that have one or more reported cases of COVID-19 (staff or resident), populations should be immediately reduced so that such cohorted living conditions as described in more detail at https://amend.us/covid/ here: https://amend.us/wp-content/uploads/2020/05/RELEASE-COHORT-TEST.Amend_.UCB_.pdf can be achieved. Given the high rates of asymptomatic spread throughout the US, such population reduction should ideally be started before a reported case occurs inside a correctional facility.

24. Within correctional systems, all residents and staff require a comprehensive understanding of the policies and practices being employed in response to the COVID-19 pandemic and trusted resources must be made available to address prevailing misconceptions on an ongoing basis.

25. We continue to hear from residents and correctional staff – uniformed officers and health care providers around the country – who lack the basic information they need to faithfully comply with standard public health practices and help reduce the spread of infection in their homes and workplaces. Overall, a lack of regular, useful communication from correctional agency leadership to staff and residents inside facilities is common in systems across the country and must be resolved if we are to avoid the scenario in which the worst of COVID-19 in the U.S. is visited upon incarcerated people and the men and women who watch over them.

I declare under penalty of perjury under the laws of the United States of America that the foregoing information is true and correct to the best of my knowledge and belief.

Executed on May 7, 2020, in San Francisco, California.

Brie Williams, MD, MS