NICHOLAS A. TRUTANICH
United States Attorney
District of Nevada
Nevada Bar Number 13644

HOLLY A. VANCE
Assistant United States Attorney
400 South Virginia Street, Suite 900
Reno, Nevada 89501
775-784-5438
holly.a.vance@usdoj.gov

*Attorneys for Defendant/Respondent*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| Jess Elijio Carranza, Jimmy Carter Kim, <br><br> Plaintiffs/Petitioners, <br><br> v. <br><br> Brian Koehn, Warden, Nevada Southern Detention Center, <br><br> Defendant/Respondent. | Case No. 2:20-cv-01586-GMN-DJA <br><br> **Motion to Dismiss and Response to Petition for Writ of Habeas Corpus (ECF No. 1)** |

Petitioners have filed a habeas petition challenging their detention at the Nevada Southern Detention Center ("NSDC") as unconstitutional due to risks posed by COVID-19. The Court lacks jurisdiction, however, to consider the petition, thereby warranting its dismissal. Alternatively, the petition is unavailing on the merits and should be denied.

## INTRODUCTION

Petitioners seek habeas relief, claiming their confinement at NSDC places them at risk for contracting COVID-19 in violation of their Fifth Amendment right to due process. According to Petitioners, NSDC officials have been "deliberately indifferent" and "objectively reckless" in response to the COVID-19 pandemic, and NSDC's response also

constitutes "punishment." Petitioners seek an order requiring Respondent to take steps to resolve the alleged deficient protocols implemented by NSDC. Petitioners also ask the Court to appoint an expert to visit NSDC and make recommendations about the "best practices" for containing the spread of the virus. Alternatively, Petitioners request release from confinement and "a court-mandated and supervised fact-finding of the actual conditions at NSDC."

For three reasons, the Court lacks jurisdiction to consider the habeas petition. First, Petitioners challenge their conditions of confinement, not the fact or duration of their confinement, and thus their claims are not cognizable in habeas. Second, Petitioners failed to exhaust their administrative remedies, and alternative remedies are available to them. Third, Petitioners lack standing to assert challenges on behalf of the entire population of NSDC detainees, and individual NSDC detainees, who are not parties to this action. Petitioners also lack standing to sue because they have not demonstrated "actual and imminent" harm. Accordingly, the habeas petition fails for lack of jurisdiction and should be dismissed.

Alternatively, the habeas petition is unavailing on the merits. Petitioners' allegations do not reflect at all the reality of what is happening at NSDC in response to COVID-19. Nor do Petitioners acknowledge the significant efforts and measures taken by Respondent to safeguard the health and well-being of NSDC detainees: mandatory screening and quarantine protocols; extensive sanitization requirements; an abundant supply of personal protective equipment; restricted-movement and social distancing requirements; and limitations to visitations. Those protocols comply with the guidelines and recommendations of The Centers for Disease Control and Prevention. Because NSDC has taken reasonable steps to protect the safety and well-being of all detainees, including Petitioners, the habeas petition fails on the merits and should be denied.

/ / /

/ / /

## BACKGROUND

NSDC is owned and operated by CoreCivic pursuant to a correctional services agreement with the U.S. Immigration and Customs Enforcement ("ICE") and the U.S. Marshals Service ("USMS"). (Ex. A ¶ 2[1]). NSDC houses both ICE immigration and USMS criminal detainees. (*Id.*). These populations are housed separately and do not intermix except under exceptional circumstances. (*Id.*). While NSDC has the ability to house 784 USMS detainees, on September 15, 2020, the facility was operating at approximately 69% of that capacity, with only 544 USMS detainees. (*Id.* ¶ 10).

As of September 15, 2020, there was only one COVID-19 case at NSDC. (*Id.* ¶ 11). This particular detainee was tested upon admission. (*Id.*). She is housed in the medical unit and has had no contact with the detainee population, including Petitioners. (*Id.*).

**NSDC's testing and treatment protocol as it relates to Petitioners' claims**

Since the outbreak of COVID-19, CoreCivic's Chief Medical Officer, Dr. K. Ivens, M.D., has been working closely with infectious disease experts and correctional medical professionals on the latest protocols to prevent the spread of the virus. (Ex. B ¶¶ 8, 10[2]). Dr. Ivens also monitors information from The Centers for Disease Control and Prevention ("CDC") on a daily basis and ensures that NSDC protocols comply with CDC guidelines and recommendations. (*Id.* ¶¶ 10-11).

COVID-19 symptoms may include the following: fever or chills; cough, shortness of breath or difficulty breathing; fatigue; muscle or body aches; headache; new loss of taste or smell; sore throat; congestion or runny nose; nausea or vomiting; and diarrhea. (*Id.* ¶ 14). Those symptoms, however, can mimic symptoms of other conditions such as the seasonal flu and common cold. (*Id.* ¶ 15). For that reason, CoreCivic has developed protocols for facility nursing staff to determine whether referral to a licensed independent provider ("LIP"), such as a doctor or nurse practitioner, is necessary. (*Id.*).

---

[1] Exhibit A is the declaration of Respondent Warden B. Koehn.

[2] Exhibit B is the declaration of Dr. K. Ivens.

Following a nursing staff referral, LIPs evaluate detainees and determine whether testing for COVID-19 is necessary based on verifiable symptoms, medical histories, CDC guidelines, and the like. (*Id.* ¶ 16). If a detainee has a fever greater than 100.4 degrees, CoreCivic policy is to test the detainee for COVID-19 unless there are no other symptoms of COVID-19 present or there is an apparent source of infection other than COVID-19 that could be causing the high temperature. (*Id.* ¶ 17). In that event, the detainee would be treated for the underlying condition first, after which they would be re-evaluated for COVID-19 symptoms to determine whether COVID-19 testing is necessary. (*Id.*). This does not mean that a detainee must have a fever of 100.4 degrees or higher to be tested for COVID-19. (*Id.* ¶ 18). Rather, it is one factor LIPs consider in determining whether, in their clinical judgment, such testing is necessary. (*Id.*).

CoreCivic does not test detainees for COVID-19 upon request, but does so only according to the procedures outlined above. (*Id.* ¶ 19). When detainees are tested for COVID-19, they are moved to medical isolation to limit the spread of the disease while their results are pending. (*Id.* ¶ 20). If their test comes back positive, they remain in medical isolation for at least 10 days from the date of the test. (*Id.*).

There are no vaccines or cures for COVID-19. (*Id.* ¶ 21). All detainees who test positive for COVID-19, or are awaiting test results, are treated according to existing clinical criteria with acetaminophen or ibuprofen (to reduce fever and for headaches and other body aches), fluids, and rest, and are evaluated by nursing staff (including temperature checks) twice per day. (*Id.*). If hospitalization is required, NSDC has the ability to transport detainees to Desert View Hospital in Pahrump. (*Id.*).

CoreCivic does not re-test detainees to determine whether they are ready to return to the general population, as tests can remain positive for up to three months after the detainees first test positive—well after the detainees have stopped being contagious. (*Id.* ¶ 22). (*See* https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html, last accessed Sept. 14, 2020.) (*Id.*). For this reason, the CDC generally does not recommend

re-testing persons who previously tested positive for COVID-19 within three months after the date of symptom onset for the initial infection. (*Id.*).

Instead, CoreCivic keeps the detainee isolated for at least 10 days, releasing them to general population when they have been without symptoms for three days without medications. (*Id.* ¶ 23). This is consistent with CDC guidelines, which allow medical isolation to be discontinued when (1) at least 10 days have passed since symptoms first appeared (or since the first positive test if the detainee is asymptomatic), (2) at least 24 hours have passed since the last fever without the use of fever-reducing medications, and (3) symptoms have improved. (*Id.*). (*See* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html, last accessed Sept. 14, 2020.).

### Petitioner Jess Elijio Carranza

**A.   Criminal charges**

Petitioner Jess Elijio Carranza is charged by indictment with one count of Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g). (Case No. 2:19-cr-310-RFB-BNW, ECF no. 1). On December 4, 2019, Carranza was physically present in federal court pursuant to a writ of habeas corpus and had his initial appearance on the indictment. (*Id.*, ECF No. 7). Carranza was ordered detained and has remained in NSDC since that time. (*Id.*). Carranza has not challenged his detention in his criminal case since his initial appearance. Carranza also remains in State custody, under case number C-19-344450-1, for assault with a deadly weapon, burglary while in possession of a firearm, and possession of a stolen vehicle and property.

**B.   Recent medical history**

Carranza is a 37-year-old male who alleges he has type 1 diabetes and high blood pressure, and that these conditions increase his risk of severe illness from COVID-19. (Ex. B ¶ 25). He further alleges that he suffered symptoms, including head and body aches, shortness of breath, and dry cough in early July 2020, and that he repeatedly requested to

be tested for COVID-19, but that his requests were denied because he did not have a fever of at least 100.4 degrees. (*Id.*).

Medical records show that Carranza has type 2 diabetes (non-insulin-dependent), as well as high blood pressure. (*Id.* ¶ 26). Type 2 diabetes is recognized by the CDC as a condition that places a person at higher risk of severe illness from COVID-19, and high blood pressure is recognized by the CDC as a condition that may place a person at higher risk of severe illness from COVID-19. (*Id.*). Carranza, however, has not suffered from any such severe illness (or COVID-19) while at NSDC. (*Id.*).

Since his arrival at NSDC in December 2019, Carranza has been seen by medical staff each time he has requested it. (*Id.* ¶ 27).

On June 13, 2020, Carranza was seen by Dr. Saavedra in the Diabetic Chronic Care Clinic ("CCC"). (*Id.* ¶ 28). He did not have a fever or report any other symptoms at that time, and his lungs were normal. (*Id.*). Dr. Saavedra reviewed Carranza's Accuchecks and diagnosed Carranza as having fair control of his diabetes (meaning his labs were less than two percentage points above the normal range), and that his condition was "unchanged/stable." (*Id.*). Dr. Saavedra ordered further lab tests, adjusted Carranza's medications, advised him to keep exercising and avoid sugars, referred him to an eye specialist for a diabetic eye exam, and scheduled him to return to the CCC in three months. (*Id.*).

That same day, Carranza was seen by Dr. Saavedra in the Cardiac Chronic Care Clinic for his high blood pressure. (*Id.* ¶ 29). He did not have a fever or report any other symptoms at that time, and his lungs were normal. (*Id.*). His blood pressure was within the "goal" limits for a patient under 60 years of age, and "unchanged" since his last CCC visit. (*Id.*). Dr. Saavedra recommended that Carranza continue to exercise and limit his salt intake, prescribed an additional blood pressure medication, and ordered that he have his blood pressure checked once a week for three months. (*Id.*).

On July 4, 2020, Carranza was evaluated by Nurse Powers for his complaint of "catching a cold," which he reported had started two days before. (*Id.* ¶ 30). He did not have a fever, and did not report fatigue, headache, chills/fever, congestion/runny nose, cough, or pain. (*Id.*). Nor did he have labored breathing, shortness of breath, or diminished lung sounds. (*Id.*). Pursuant to the approved protocol, Nurse Powers recommended CCP Caffeine Free ("CCP"), a cold medication that is a combination of an expectorant (to loosen mucus in the lungs), a decongestant, and acetaminophen (for pain and fever), twice a day for four days (which Dr. Rivas authorized). (*Id.*). She also instructed Carranza to return to sick call if his symptoms persisted. (*Id.*).

Carranza, however, refused his evening dose of CCP on July 5, and did not report to pill call for his morning dose of CCP on July 6, 7, or 8, 2020. (*Id.* ¶ 31).

On July 9, 2020, Carranza was evaluated by Nurse Krueger in his housing unit in response to complaints of shortness of breath. (*Id.* ¶ 32). When Carranza approached the nurse without a facemask, she asked him to put one on, but he responded that he could not breathe with it on. (*Id.*). Carranza otherwise denied any shortness of breath, and his respirations were even and non-labored. (*Id.*). He reported he felt well, and denied any other symptoms. (*Id.*).

In accordance with the established protocol set forth above, Carranza's symptoms on July 4 and July 9, 2020 did not warrant testing for COVID-19. (*Id.* ¶ 33). He did not submit any other written Sick Call Requests for symptoms related to COVID-19 or asking to be tested for COVID-19 in July 2020, or at any time since then. (*Id.*). Facility nursing staff responded promptly and appropriately to all Sick Call Requests he did submit during that timeframe. (*Id.*).

Dr. Ivens has reviewed Carranza's medical records and concluded that his health conditions are being appropriately controlled at the facility. (*Id.* ¶¶ 26, 34).

/ / /

/ / /

**Petitioner Jimmy Carter Kim**

**A.   Criminal charges**

Petitioner Jimmy Carter Kim is charged by complaint with Kidnapping, in violation of 18 U.S. §§ 1201(a)(1) and (g), Sexual Exploitation of Children, in violation of 18 U.S.C. §§ 2251(a) and (e). (Case No. 2:18-mj-836-DJA, ECF No. 1). On September 28, 2018, Kim was physically present in federal court pursuant to a writ of habeas corpus and had his initial appearance on the complaint. (*Id.*, ECF No. 7). Kim submitted on the issue of detention and was ordered detained. (*Id.*). Kim has remained in NSDC since that time. (*Id.*). His preliminary hearing is currently set for October 16, 2020. (*Id.*, ECF No. 35). Kim has not challenged his detention in his criminal case. He also remains in State custody, under case number C-16-313094-1, where he is charged with numerous additional sex offenses.

**B.   Recent medical history**

Kim is a 31-year-old male who alleges he tested positive for COVID-19, was kept in medical isolation for 14 days, and was returned to his housing unit without being re-tested. (Ex. B ¶ 35). He further alleges that, in early July, he collapsed on the floor in medical after he tested positive, and that his symptoms included fever, chest pains, dry mouth, fatigue, head and body aches, difficulty breathing, stiff joints, lock jaw, and that his arms and legs were "seizing up." (*Id.*). Kim alleges he had to be picked up off the floor and placed in a wheelchair to be taken to medical isolation, and that staff did not give him any medicine to treat his symptoms or schedule him to see a doctor while he was in isolation. (*Id.*).

Kim has no history of any conditions that place him at increased risk of severe illness from COVID-19 pursuant to CDC guidelines, and he has suffered no such severe illness. (*Id.* ¶ 36).

On July 4, 2020, Kim was evaluated by Nurse Powers for his complaint of "catching a cold," which he reported had started two days before. (*Id.* ¶ 37). He reported congestion, sneezing, and headache, but did not have a fever at that time, and did not report fatigue, chills/fever, congestion, cough, or pain. (*Id.*). Nor did he have labored breathing, shortness

of breath, or diminished lung sounds. (*Id.*). Pursuant to the approved protocol, Nurse Powers recommended CCP twice a day for four days (which Dr. Rivas authorized), and told Kim to return to sick call if his symptoms persisted. (*Id.*).

Kim, however, refused his morning dose of CCP on July 5, and was inconsistent in taking it over the next three days, taking only his evening dose on July 5 and his morning and evening doses on July 7, 2020. (*Id.* ¶ 38).

On July 6, 2020, Health Services Administrator ("HSA") Holley evaluated Kim in his housing unit, and noted he had a temperature of 99.6 degrees. (*Id.* ¶ 39). Kim was then taken to the medical unit, where he denied having any symptoms and said his temperature was probably due to the fact that he was wearing three shirts at the time his temperature was taken. (*Id.*). Nevertheless, Kim was tested for COVID-19. (*Id.*). On July 8, 2020, he was confirmed positive for COVID-19. (*Id.* ¶ 40).

On July 9, 2020, Kim reported to Nurse Practitioner ("NP") Peterson that he felt well, and he denied fever, chills, cough, and shortness of breath. (*Id.* ¶ 41). He also complained to NP Peterson that he was singled out for testing, while other detainees in his pod were not tested. (*Id.*).

On July 20, 2020, Kim was seen by Dr. Rivas. (*Id.* ¶ 42). He denied having any symptoms whatsoever while in isolation, and specifically denied any fever, chills, chest pain, shortness of breath, changes in taste or smell, or other pertinent symptoms. (*Id.*). He reported having no concerns at that time. (*Id.*). Dr. Rivas therefore cleared Kim to return to his housing unit, but did not order that he be re-tested consistent with the procedures outlined above. (*Id.*).

Kim's symptoms on July 4, 2020, did not warrant testing for COVID-19. (*Id.* ¶ 43). He has not submitted any written Sick Call Requests since then for symptoms related to COVID-19 or for any other purpose. (*Id.*). There is no record in his medical file of his having collapsed on the floor and been placed in a wheelchair at any time before or after he tested

positive for COVID-19. (*Id.*). If that had occurred, a progress note detailing the medical care he received as a result would have been created in his medical file. (*Id.*).

There is no evidence that Kim has suffered any form of severe illness—or any symptoms of any sort other than a mild fever—from COVID-19, including residual issues. (*Id.* ¶ 44). He has no history of any medical conditions that place him at increased risk. (*Id.*). Although it is not yet clear that a person cannot contract COVID-19 for a second time after recovering from it once, it is also not clear that a person can do so. (*Id.*).

Dr. Ivens has reviewed Kim's medical records and concluded that his health conditions are being appropriately controlled at NSDC. (*Id.* ¶¶ 36, 45).

## ARGUMENT

### A.   Petitioners' claims are not cognizable in habeas.

Habeas is not the proper vehicle to challenge a detainee's conditions of confinement. *See Nelson v. Campbell*, 541 U.S. 637, 643 (2004) ("[C]onstitutional claims that merely challenge the conditions of [] confinement, whether the inmate seeks monetary relief or injunctive relief, fall outside [the] core [of habeas corpus relief]."); *Nettles v. Grounds*, 830 F.3d 922, 933 (9th Cir. 2016) (rejecting habeas as the proper remedy to raise a constitutional challenge to the failure to sequester inmates with AIDS from the general prison population). On the contrary, habeas is available only to detainees who challenge the lawfulness or duration of their detention. *See Muhammad v. Close*, 540 U.S. 749, 750 (2004) ("Challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus."); *Craig v. McCarthy*, 883 F.2d 1023 (9th Cir. 1989) ("[A] prisoner's complaints that terms and conditions of his confinement constitute cruel and unusual punishment, violate due process, or abridge constitutionally protected privacy interests are not redressable by a habeas petition.").

Moreover, where an inmate alleges that his confinement poses a substantial risk of serious harm to his health, the claim is properly raised in a civil rights action. *See Muhammad*, 540 U.S. at 750 (requests for relief relating to the circumstances of confinement

may be presented in a civil rights action, while challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus); *Nelson*, 541 U.S. at 643 (claims challenging the conditions of confinement "fall outside of th[e] core [of habeas corpus]" and may be brought in a civil rights action); *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973). ("a [42 U.S.C.] § 1983 action is a proper remedy for a state prisoner who is making a constitutional challenge to the conditions of his prison life, but not to the fact or length of his custody"); *Hutcherson v. Riley*, 468 F.3d 750, 754 (11th Cir. 2006) ("The line of demarcation between a § 1983 civil rights action and a § 2254 habeas claim is based on the effect of the claim on the inmate's conviction and/or sentence.").

Here, the habeas petition makes it clear that Petitioners are challenging the conditions—rather than the validity—of their confinement:

- The habeas petition's heading III is entitled "*Conditions* at NSDC." (ECF No. 1 p. 6) (emphasis added);

- "Below is a summary of current *conditions* at NSDC relevant to this petition." (*Id.* p. 7) (emphasis added);

- The habeas petition requests the following order: "If Constitutional *conditions of confinement* cannot be established, order Petitioners' [sic] released pending trial.") (*Id.* at 21) (emphasis added);

- The habeas petition requests the following order: "Court-ordered and supervised fact-finding of the actual *conditions* at NSDC.") (*Id.*) (emphasis added);

- "[Dr. Magner] further recommends that precautions be taken to ensure that these measures do not result in deterioration of *conditions* for detainees[.]") (*Id.* p. 6) (emphasis added);

- "Petitioners are also subject to more restrictive *conditions of confinement* than they would otherwise be because the facility must continually quarantine/cohort and un-quarantine affected units and individuals.") (*Id.* at 18) (emphasis added).

Because the habeas petition challenges conditions of confinement rather than the legality or duration of Petitioners' sentences, the Court lacks jurisdiction to consider their claims. Accordingly, the petition fails for lack of jurisdiction and should be dismissed. *See*

*Shook v. Apker,* 472 F. App'x 702, 702-03 (9th Cir. 2012) (affirming dismissal of petition raising claims of inadequate medical care under habeas statute); *Dawson v. Asher*, 2020 WL 1704324, at *8 (W.D. Wash. Apr. 8, 2020) ("The basis for Petitioners' claim rests on specific conditions within the NWDC that Petitioners allege expose them to a greater risk of contracting COVID-19 … Petitioners do not raise any separate challenge to the authority under which they were detained or the length of their detention."); *Wilson v. Ponce*, 2020 WL 3053375, at *10 (C.D. Cal. June 8, 2020) (denying habeas relief for alleged conditions-of-confinement claims stemming from COVID-19); *Alvarez v. Larose*, 2020 WL 2315807, at *3 (S.D. Cal. May 9, 2020) (holding that habeas petition was not proper because the petitioners' claims "[were] based solely on the current conditions…given the COVID-19 pandemic").[3]

**B.   Petitioners failed to exhaust their administrative remedies.**

To seek habeas relief, "a petitioner must first, 'as a prudential matter,' exhaust his or her available administrative remedies." *Singh v. Napolitano*, 649 F.3d 899, 900 (9th Cir. 2010). Requiring a prisoner to exhaust remedies aids judicial review "by allowing the appropriate development of a factual record in an expert forum." *Ruviwat v. Smith*, 701 F.2d 844, 845 (9th Cir. 1983). Exhaustion conserves "the court's time because of the possibility that the relief applied for may be granted at the administrative level." *Id*. Exhaustion also "protects 'administrative agency authority'" and gives an agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006).

The Prison Litigation Reform Act ("PLRA") also imposes an exhaustion requirement. *See Porter v. Nussle*, 534 U.S. 516, 519 (2002) (The PLRA requires "prisoners who claim denial of their federal rights while incarcerated to exhaust prison grievance

---

[3] Respondent is aware of at least one decision to the contrary in this Circuit. *See Alvarez v. Larose*, 2020 WL 3053193, at *3 n. 1 (S.D. Cal. June 7, 2020 ("Plaintiff *may* bring either kind of challenge—'fact or duration of confinement' or conditions of confinement—in a habeas proceeding." (emphasis added).

procedures before seeking judicial relief."). Specifically, the PLRA provides: "No action shall be brought with respect to prison conditions under … any … Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford*, 548 U.S. at 85 ('Exhaustion … is mandatory."). The PLRA's mandatory exhaustion requirement applies equally to pretrial criminal detainees. 42 U.S.C. § 1997e(h). Indeed, the provision applies to "all inmate suits about prison life[.]" *Porter*, 534 U.S. at 532.

Exhaustion requires compliance with "all steps" of the facility's grievance system. *Woodford*, 548 U.S. at 88, 90-91. Strict compliance is necessary so officials are alerted to "the nature of the wrong for which redress [is] sought" and can "take corrective action where appropriate." *Fuqua v. Ryan*, 890 F.3d 838, 844 (9th Cir. 2018). Claims that are not properly and fully exhausted before filing suit are barred. *Jones v. Bock*, 549 U.S. 199, 211 (2007); *McKinney v. Carey*, 311 F.3d 1198, 1199-1201 (9th Cir. 2002). "This exhaustion obligation is mandatory—there are no futility or other judicially-created exceptions to the statutory exhaustions requirements." *Valentine v. Collier*, 956 F.3d 797 (5th Cir. 2020). Nor is a detainee or inmate excused from complying with a facility's grievance process because of the "special circumstances of the COVID-19 crisis." *Id.*; *Marlowe v. LeBlanc*, 2020 WL 2043425, at *3 (5th Cir. Apr. 27, 2020).

Here, NSDC has a grievance process available to its detainees. (Ex. A ¶ 104). Petitioners, however, declined to utilize that process to raise their habeas claims. (*Id.* ¶¶ 105-06). Because they failed to exhaust their administrative remedies, their habeas petition fails for lack of jurisdiction and should be dismissed. *See United States v. Tomlinson*, 2020 WL 1935522, at *1 (D. Ariz. Apr. 22, 2020) (denying federal prisoner's request for early release for failure to exhaust administrative remedies in accordance with 18 U.S.C. § 3582(c)(1)(A)(i)); *Shaw v. Bank of Am. Corp.*, 946 F.3d 533, 541 (9th Cir. 2019) ("[S]tatutorily-provided exhaustion requirements deprive the court of jurisdiction and, thus, preclude any exercise of jurisdiction by the Court.").

**C.    Petitioners have adequate remedies available at law.**

Injunctive relief is not available when there is an adequate remedy available at law. *Matthews v. Rodgers*, 284 U.S. 521, 525 (1932) (injunctive relief is not available in federal court "in any case where plain, adequate and complete remedy may be had at law"); *Dillon v. Montana*, 634 F.2d 463, 466 (9th Cir. 1980). Moreover, courts abstain from considering pretrial habeas petitions if the issues raised may be resolved by other procedures available in the pending criminal case. *Fay v. Noia*, 372 U.S. 391, 417-20 (1963).

Here, Petitioners are precluded from obtaining injunctive relief via habeas because other avenues of relief are available to them. First, Petitioners could have, and indeed procedurally should have, pursued grievance procedures at NSDC in accordance with the PLRA, as argued above. They have failed to do so. Second, Petitioners may seek relief under the Bail Reform Act. That provision expressly authorizes the district court handling a criminal matter to consider, and even reconsider, an individual defendant's health when deciding whether to detain him or her pending trial. 18 U.S.C. § 3142(f)(2)(B) ("The hearing may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."). Third, Petitioners may file a civil rights action challenging the conditions of their confinement. *See Preiser*, 411 U.S. at 499 ("a [42 U.S.C.] § 1983 action is a proper remedy for a state prisoner who is making a constitutional challenge to the conditions of his prison life, but not to the fact or length of his custody"); *Barroca v. Maggy*, 84 F. App'x 849, 850 (9th Cir. 2003) (affirming district court's dismissal order that construed habeas petition seeking emergency medical care as civil rights complaint). Because other avenues of relief are available to Petitioners, they are precluded from challenging the conditions of their confinement through habeas. *See Reese v. Warden Philadelphia FDC*, 904 F.3d 244, 246-48 (3d Cir. 2018) (holding that habeas is an

1    inappropriate collateral attack when pretrial detainees can seek release in their pending
2    criminal cases).

3    **D.    Petitioners cannot establish standing.**

4          Article III of the Constitution limits the jurisdiction of the federal courts to certain
5    "cases" and "controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013). Petitioners
6    are required to satisfy three elements to establish standing to sue in federal court: 1) an
7    "injury in fact" that is "concrete and particularized" and "actual and imminent"; 2) the
8    injury is "fairly traceable" to defendant's conduct; and 3) the injury can be redressed through
9    adjudication. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Where a plaintiff lacks
10   standing, the action fails for lack of jurisdiction because there is no "case or controversy."
11   *City of Oakland v. Lynch*, 798 F.3d 1159, 1163 (9th Cir. 2015). Here, Petitioners lack standing
12   in two respects.

13         First, Petitioners make a number of allegations about the conditions of confinement
14   at NSDC, but fail to allege, or demonstrate, that those conditions are peculiar to them, or
15   that they sustained harm from those conditions. Instead, they allege that the conditions are
16   impacting the entire inmate population at NSDC, and certain unnamed inmates, who are
17   not parties to this action. *See, e.g.*, ECF No. 1 p. 7 ("The NSDC increases the risk of infection
18   for detainees in a number of ways[.]"); *Id*. p. 8 ("a detainee reported that he had just been
19   released from quarantine—where he had been placed after exhibiting symptoms *but without*
20   *being tested*) (emphasis in original); *Id*. ("Numerous detainees in Unit G4 fell ill and
21   requested testing during this time but were denied."); *Id*. at 11 ("At least one detainee
22   reported watching a COVID-19 positive detainee being removed from his unit and his bunk
23   was not being sanitized after."); *Id*. at 13 ("[O]ne detainee's appointment to have an infected
24   tooth extracted has been repeatedly cancelled, as was another's x-ray appointment. A
25   female detainee's appointment for an MRI and surgical referral was repeatedly cancelled
26   despite a breast mass and discharge.").

27
28

Petitioners are precluded, however, from asserting challenges based on the experiences of other inmates at NSDC or the entire inmate population as a whole, particularly where Petitioners have neither alleged, nor demonstrated, that they suffer from the purported harm associated with those groups. Accordingly, Petitioners lack standing to sue and their habeas petition should be dismissed. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-02 (1988) ("[F]ederal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation. Such a concern cuts to the heart of the case-and-controversy of Article III. Courts should not adjudicate rights unnecessarily; the real parties in interest in an adversarial system are usually the best proponents of their own rights.").

Second, Petitioners have failed to demonstrate an "actual and imminent" harm based on COVID-19. They have not established that the virus has spread throughout the facility, nor have they shown that the detainee population at NSDC is at risk for contracting the virus. Instead, they merely speculate with bald, unsubstantiated assertions that detention at NSDC increases the risk of COVID-19 infection for all detainees at the facility. Petitioners ignore, however, the significant safety measures implemented by NSDC that dramatically reduce any risk of harm. Moreover, the effectiveness of NSDC's protocols is demonstrated by the fact that, as of September 15, 2020, there was only one COVID-19 case at NSDC. More significantly, that person has not had any contact with any detainee in the facility, thereby establishing that there is no risk of harm to anyone at NSDC.

Petitioners' request for a "Court-mandated and supervised fact-finding of the actual conditions at NSDC" (ECF No. 1 p. 21) further confirms that there is no "actual and imminent harm" at the facility. If the conditions at NSDC are as unsafe as Petitioners claim, they would not need a "fact-finding" to determine what those "actual conditions" are. Their request makes it clear that in fact they do not know what NSDC's current conditions are. Under the circumstances, they have no basis for alleging, or demonstrating, that the conditions are unconstitutional.

Petitioners' request that an expert visit NSDC and "make recommendations to the Court about best practices for containing the spread of COVID-19" (*id.* at 18) is equally problematic. If Petitioners do not yet know what the "best practices" are for containing COVID-19, then surely they have no basis for challenging NSDC's current protocols. Indeed, their request for an expert and Court "fact-finding" is nothing more than a fishing expedition—clearly, an inappropriate justification to warrant habeas relief. *See Lucero-Gonzalez v. Kline*, 2020 WL 2987002, at *9 n. 24 (D. Ariz. June 2, 2020) ("that plaintiff seeks an expert to determine 'whether' Defendants have violated their rights smacks of a fishing expedition").

In short, Petitioners have failed to establish an "actual and imminent harm" at NSDC based on COVID-19—to either themselves or other detainees. Because Petitioners' allegations of harm are hypothetical, they lack standing to bring this action.

**E.    Petitioners must seek release through the Bail Reform Act and/or the PLRA.**

In their prayer for relief, Petitioners request the following from the Court: "If Constitutional conditions of confinement cannot be established, order Petitioners' [sic] released pending trial." (ECF No. 1 p. 21). Release, however, is an improper remedy for a conditions-of-confinement claim. When a petitioner successfully challenges the conditions of his confinement, he is entitled to "a judicially mandated change in conditions and/or an award of damages, but not release from confinement." *Crawford v. Bell*, 599 F.2d 890, 892 (9th Cir. 1979).[4]

Moreover, habeas relief is improper where detainees may seek relief in their criminal cases. *See Reese v. Warden Philadelphia FDC*, 904 F.3d 244, 246-48 (3d Cir. 2018) (joining the holdings of the Fifth and Seventh Circuits that "a federal detainee's request for release pending trial can only be considered under the Bail Reform Act and not under a § 2241

---

[4] The fact that release is requested as an alternative remedy does not transform the pleading into a proper habeas petition. Instead, the petition is really a conditions-of-confinement claim that includes an improper request for remedy.

petition for habeas relief"); *Medina v. Choate*, 875 F.3d 1025, 1029 (10th Cir. 2017) (adopting "the general rule that § 2241 is not a proper avenue of relief for federal prisoners awaiting federal trial"). Here, Petitioners have two avenues of relief in their criminal cases: the Bail Reform Act and the PLRA.

Under the Bail Reform Act, a pretrial detainee can seek release pending trial where a "judicial officer" may consider, among other things, the individual "characteristics" of the defendant and his or her "physical and mental condition." 18 U.S.C. § 3142(g)(3)(A). Under the PLRA, a three-judge court is authorized to consider and order the release of an inmate. 18 U.S.C.  § 3626(a)(3)(B). The PLRA's release provision divests this Court of authority to release Petitioners in habeas. *See Alvarez v. Larose*, 445 F. Supp. 3d 861, 864 (S.D. Cal. 2020) (holding "the PLRA applies to Plaintiffs' claims and divests the Court of authority to grant" their "release").

## F.    The request for declaratory relief is redundant and unnecessary.

The habeas petition requests an order "declaring the current conditions at NSDC unconstitutional[.]" (ECF No. 1 p. 18). That request, however, will be decided, if at all, as part of Petitioners' Fifth Amendment claim, which specifically challenges the conditions at NSDC as unconstitutional due to COVID-19. Because the Court will necessarily resolve the request for declaratory relief when it rules on the Fifth Amendment claim, the declaratory-relief request is redundant and serves no purpose. Accordingly, the request should be dismissed. *See Clifford v. Geico Ca. Co.*, 428 F. Supp. 3d 317, 326 (D. Nev. 2019) ("Declaratory relief should be denied where it is redundant or where it will serve no purpose in clarifying the dispute between the parties."); *Fosmire v. Progressive Max. Ins. Co.*, 2020 WL 3489595, at *5 (W.D. Wash. Aug. 31, 2010) (dismissing a claim for declaratory relief regarding the defendant's obligations under a contract because it was duplicative of the plaintiff's breach of contract claim).

**G.    The docket does not demonstrate that the Court has authorized the appointment of the Federal Public Defender's Office to represent Petitioners in this action.**

The Federal Public Defender's Office ("FPD") filed this habeas petition on behalf of Petitioners. (ECF No. 1). The record does not reflect, however, that the FPD followed the mandatory protocol set forth in 18 U.S.C. § 3006A(2)(B). That statute permits the Court to provide representation "for any financially eligible person" who "is seeking relief under [28 U.S.C.] section 2241" when the Court "determines that the interests of justice so require[.]" 18 U.S.C. § 3006A(2). The "interests of justice" standard requires the Court to "evaluate the likelihood of success on the merits as well as the ability of the petitioner to articulate his claims pro se in light of the complexity of the legal issues involved." *Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983*); see also United States v. Fitch*, 2018 WL 1915077, at *3 (D. Nev. April 23, 2018) (discussing the interests of justice standard and denying the appointment of counsel in a habeas case); *Keller v. Baca*, 2016 WL 11696860, at *1 (D. Nev. July 19, 2016) (same).

Here, the docket does not demonstrate that the FPD has followed the steps required by 18 U.S.C. § 3006A(2). Under the circumstances, dismissal of the petition may be warranted. *See also Keller*, 2016 WL 11696860, at *1 ("Petitioner has no constitutional right to appointed counsel in a federal habeas proceeding.").

**H.    Petitioners' conditions of confinement do not violate the Fifth Amendment.**

Even if the Court finds Petitioners can somehow overcome the multiple jurisdictional infirmities identified above, it should nevertheless deny the petition on the merits. Petitioners argue that Respondent violated their right to due process under the Fifth Amendment in two ways: 1) by failing to take objectively reasonable measures to protect them from COVID-19, and 2) by imposing conditions of confinement that amount to punishment. (ECF No. 1 pp. 16-17). Neither argument has merit.

/ / /

/ / /

**1.    The habeas petition fails because the evidence offered does not support the claims.**

Petitioners have included two declarations—one from Karla D. Magner and the other from Brie Williams—to support their habeas petition. (ECF No. 1 pp. 6-7). For three reasons, the Court should disregard those declarations. First, Magner and Willams make only general statements about COVID-19 as it relates to prisons and detention facilities. Neither witness includes any discussion at all about NSDC in particular or Petitioners specifically. Thus, their comments are not germane to assessing NSDC's response to COVID-19 or Petitioners' allegations. Second, Magner and Williams have not visited NSDC or otherwise personally observed NSDC operations during the pandemic. It follows that neither witness has personal knowledge about the conditions of confinement at the facility. Third, Magner's declaration is dated May 8, 2020 and Williams' declaration is dated May 7, 2020. Because their declarations are more than four months old, the witnesses cannot speak to the pivotal issue here—the effectiveness of the *current* COVID-19 protocols at NSDC. The Magner and Williams declarations thus have no bearing on the questions at issue in this action. Accordingly, the Court should disregard the declarations and dismiss the habeas petition. *See* Habeas Rule 4 ("If it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court, the judge *must* dismiss the petition and direct the clerk to notify the petitioner.") (emphasis added); *Schulp v. Delo*, 513 U.S. 298, 332 (1995) (allowing district courts to consider the credibility and reliability of declarations submitted with habeas petitions).

The habeas petition also cites, and relies on, a declaration from Michele Blackwill, an FPD investigator. (ECF No. 1 p. 7 n. 21). The referenced declaration, however, is neither attached to the habeas petition nor otherwise offered for consideration. The Court should thus disregard the allegations that are purportedly based on the missing declaration. *See* Habeas Rule 4; *Schulp*, 513 U.S. at 332. Lastly, Petitioners cite as support for their petition: "court proceeding[s], court filings, and informal testing reports provided by the USMS."

(*Id.* p. 7). But Petitioners do not identify which allegations in the petition derive from those sources. Nor do Petitioners provide citations to those purported sources to allow Respondent to meaningfully assess and respond to them. Under the circumstances, the Court should disregard the allegations that purportedly arise from those sources. *See* Habeas Rule 4; *Schulp*, 513 U.S. at 332.

In sum, the evidence Petitioners offer to support their habeas petition is not germane to the issues raised and does not support their claims. That glaring deficiency warrants a dismissal of the petition. *See* Habeas Rule 4; *Schulp*, 513 U.S. at 332. In any event, Petitioners' claims fail on the merits, for the reasons argued below.

### 2.   Background facts as to NSDC's COVID-19 practices and protocols

#### a.   Intake Screening and Efforts to Mitigate the Risk of COVID-19

CoreCivic recognizes the unique and exceptional nature of the current COVID-19 pandemic, and takes seriously its responsibility to protect the safety and security of the detainees and inmates in its facilities, its staff, its contractors' employees, its governmental partners' employees, and the public as a whole. (Ex. A. ¶ 12). CoreCivic's Facility Support Center ("FSC"), located in Brentwood, Tennessee, developed company-wide protocols in response to COVID-19, which are implemented based on each facility's unique population, physical plant, and safety and security concerns. (*Id.* ¶ 13). FSC provides ongoing guidance and instruction to its facilities, including NSDC, consistent with recommendations of the CDC and its governmental partners, as well as state and local health authorities where its facilities are located. (*Id.*). As additional recommendations are made in consideration of localized health conditions, practices to prevent the spread of COVID-19 at NSDC have evolved, with changes occurring sometimes on a daily basis. (*Id.*).

FSC has also activated its Emergency Operations Center ("EOC"), which allows for effective communication and guidance to all CoreCivic facilities in a timely manner as to daily developments regarding COVID-19 information, CDC guidance, and developing operational modifications and enhancements. (*Id.* ¶ 14). Each week and based on need

(including a COVID-19 positive test or significant change in circumstances), CoreCivic facility administrators participate in a conference call with CoreCivic's EOC to review current and new protocols, receive CDC updates, and discuss additional concerns and requests. (*Id.* ¶ 15). CoreCivic facility leaders also participate in a call once a week to discuss new protocols, receive CDC updates, and discuss additional concerns and requests related to the response to COVID-19. (*Id.*). Further, all CoreCivic facility administrators have access to an intranet sharepoint site that contains all company-wide information, communications, and updated protocols related to COVID-19. (*Id.*).

NSDC has its own daily briefing with facility leadership and designated supervisory staff to discuss daily issues and assign tasks associated with COVID-19 operational responses. (*Id.* ¶ 16). NSDC's COVID-19 Checklist guides daily responsibilities employed to ensure staff are timely apprised of new developments concerning COVID-19 exposure and infection risks. (*Id.*). Daily responsibilities are assigned to the Warden (or the Administrative Duty Officer); each Shift Supervisor (or designed Assistant Shift Supervisor); Unit Manager; Safety Manager; Health Services Administrator; contracted Food Service Manager; and Quality Assurance Manager. (*Id.*). The purpose of this checklist is to ensure that each of those facility supervisors is timely aware of new developments and is speaking with staff and detainees about following appropriate precautions; encouraging staff and detainees to seek medical care if they feel ill or show signs of illness; monitoring staff and detainees for signs of illness; engaging in ongoing education efforts with staff and detainees; verifying ample supplies of appropriate materials; and conducting sanitation inspections on a daily basis in their delegated area of responsibility. (*Id.*). *See* Attachment A (NSDC COVID-19 Checklist).

Respondent is in continual contact with ICE and USMS officials to keep NSDC's government partners updated on protocols and procedures at the facility, to report on the status of facility operations and detainee health statistics, and to address concerns or directives that ICE or USMS may have regarding NSDC operations. (Ex. A ¶ 17).

The Health Services Administrator is in frequent contact with the Nye County Health Department and other local government bodies and officials to provide updates as to infection rates and to ensure any applicable state and local protocols are met. (*Id.* ¶ 18).

In February 2020, CoreCivic issued an initial Pandemic Coronavirus plan that has been continually updated as more becomes known about the virus, and additional guidance is provided by the CDC. (*Id.* ¶ 19). *See* Attachment B (CoreCivic Pandemic Coronavirus Plan). CoreCivic also initiated a COVID-19 Medical Emergency Plan that has been implemented at all CoreCivic facilities, including NSDC. (Ex. A ¶ 20). *See* Attachment C (Medical Emergency: Pandemic Coronavirus (COVID-19) Plan).

On approximately March 25, 2020, CoreCivic initiated a Medical Management of COVID-19:  Quarantine High Risk Inmates/Detainees plan in order to employ operational strategies for quarantine of those who are at higher risk for contracting COVID-19.  (Ex. A ¶ 21). *See* Attachment D (Medical Management of COVID-19: Quarantine High Risk Inmates/Detainees in Every Facility and correspondence from Managing Director of Operations D. Berkebile to Wardens dated 3/25/20). Heightened-risk detainees are currently housed in in F1. (Ex. A ¶ 21). NSDC began taking steps to prevent the introduction of COVID-19 on approximately March 7, 2020. (*Id.* ¶ 22).

All individuals who wish to enter the facility (including new detainees) are subject to health screening. (*Id.* ¶ 23). Consistent with CDC Interim Guidance, the screening consists of a questionnaire and temperature check. (*Id.*). Social distancing is also practiced during the entrance screening process. (*Id.*). Staff who conduct intake screening wear personal protective equipment and process intake in a manner that allows for physical/social distancing.  (*Id.*). *See* Attachment E (Photographs of NSDC Lobby).

The screening questionnaire asks the following questions: (1) Has the person traveled out of the country in the last 10 days? (2) Is the individual experiencing any symptoms associated with COVID-19? and (3) Has the person been in close contact with anyone who has tested positive for COVID-19? (*Id.* ¶ 24). If a person answers affirmatively to a screening

question, or if the person exhibits symptoms of COVID-19, including a fever in excess of 100.4 degrees, that individual is denied entry into the facility. (*Id.*).

If a CoreCivic employee is denied entry, that person is sent home and directed to see a healthcare provider for further screening. (*Id.* ¶ 25). Those who have been denied entrance must obtain clearance from their medical provider and provide documentation before they will be admitted into the facility. (*Id.*). Likewise, if any staff member experiences symptoms at work, that individual is immediately sent home and directed to see a healthcare provider as soon as possible. (*Id.*).

CoreCivic employees who have been denied entry after screening are instructed to self-quarantine at home for 10 days, or until they are symptom-free. (*Id.* ¶ 26). During that time, they will be paid and the leave time will not be charged against the employee's leave balance—provided documentation from a physician indicates the employee sought medical evaluation for COVID-19 exposure. (*Id.*). This measure is designed to eliminate any incentive for a potentially infected employee to "tough it out" and attempt to report to work. (*Id.*).

Following the entrance health screening, persons permitted to access the facility are still required to complete a security screening. (*Id.* ¶ 27). Only one person may enter security screening at a time. (*Id.*). Generally, the security screening resembles most airport security screenings, where items carried by, or to be removed from, a person screened are placed in bins and sent through a scanner. (*Id.*). At NSDC, officers who manage the scanners disinfect the bins regularly throughout the day. (*Id.*). They also wear protective gloves such that only the owners of the items screened touch the property with ungloved hands. (*Id.*).

When detainees arrive at the facility, their temperature is taken when they exit the transport vehicle. (*Id.* ¶ 28). They are then transported to a medical exam room in intake, where an extensive medical history workup is completed, which includes questioning about possible COVID-19 exposure, vulnerability, and symptoms, as described above. (*Id.* ¶ 29). Their temperature is then taken again. (*Id.*).

If a detainee reports any possible exposure, or exhibits any COVID-19 symptoms, the person is immediately taken to the medical unit to be assessed for COVID-19 testing. (*Id.* ¶ 30). If an incoming detainee passes the screening procedures described above, that individual is housed in either the AA or CA Pod and (absent exceptional circumstances) quarantined for ten days. (*Id.* ¶ 31).

The AA Pod can house 136 detainees. (*Id.* ¶ 32). The CA Pod can house 103 detainees. (*Id.*). This allows each arrival group to be separated from other groups who are also subject to the ten-day quarantine period. (*Id.*). Arrival groups do not mix. (*Id.*). For example, if eight detainees arrived on September 1, and two arrived on September 6, the eight detainees would be celled with each other (two to a cell) and the two detainees would be celled together. (*Id.* ¶ 33). They would only be permitted out of their cell at the same time as others with whom they arrived. (*Id.*). This prevents one arrival group from coming in contact with another arrival group. (*Id.* ¶ 34).

All detainees in the AA and CA Pods are monitored by medical staff, which includes having their temperature taken twice a day. (*Id.* ¶ 35). USMS detainees who are experiencing COVID-19 symptoms during the ten-day quarantine period are logged on a Symptom Monitoring Log. (*Id.*). *See* Attachment F (USMS Symptom Monitoring Log).

When quarantined, detainees have access to a law library and telephones. (Ex. A ¶ 36). The quarantine units also show movies. (*Id.*). Pursuant to policy, all detainees in restrictive housing units are escorted in handcuffs while in the unit. (*Id.*). If a detainee is quarantined in the medical unit, or is moved outside a restrictive housing unit, this would not apply. (*Id.*).

Detainees are regularly advised of the importance of social distancing and are reminded to stay six feet apart by staff during their rounds. (*Id.* ¶ 38).

To reduce the possibility of cross-contamination, officers are assigned to a primary post and, with limited exceptions, work the same unit each day. (*Id.* ¶ 39). Staff who work in quarantined units do not work in other units. (*Id.*).

All programs were canceled to allow for social distancing. (*Id.* ¶ 40). Program packets are now distributed to detainees in their housing pods. (*Id.*).

NSDC provides satellite feeding (meals are brought to detainees inside their housing pods) in all housing pods. (*Id.* ¶ 41). For celled pods, detainees are fed in their cells. (*Id.*). For dormitory pods, detainees retrieve their food tray inside the pod and are permitted to eat in the dayroom or at their bunk.  (*Id.*). Disposable Styrofoam trays are now used for all meals. (*Id.*).

Petitioners claim that "detainees" are being denied access to "programming; communication with their attorneys, other professionals, families, and friends; outside medical services; and public safety information." (ECF No. 1 at 7). This is inaccurate. (Ex. A. ¶ 42). While NSDC has placed a hold on all social visits (such as visits from friends and family) to limit the number of people entering the facility and interacting with detainees, a video message program was implemented on September 1, 2020, whereby detainees are afforded the opportunity to send video messages to their friends and family. (*Id.* ¶ 43) Additionally, detainees are able to utilize the mail and telephone to communicate with their loved ones. (*Id.*).

Prior to COVID-19, no telephone calls were free. (*Id.* ¶ 44). As a result of COVID-19, the USMS permitted one free call a week, for a maximum of 20 minutes. (*Id.*). Additionally, CoreCivic expanded the ability to purchase phone time from once to twice a week. (*Id.*).  Local telephone calls are 10 cents a minute. (*Id.*). Out of state calls are 21 cents per minute. (*Id.*). Petitioners allege there are only five telephones in the G4 Unit for "around 90 people." (ECF No. 1 ¶ 49). This is incorrect. (Ex. A ¶ 44). There are six telephones. (*Id.*). On September 15, 2020, the population of G4 was 61. (*Id.*).

Face-to-face legal visits are generally suspended, although such visits will be permitted on a case-by-case basis after the attorney is screened for infection in accordance with screening protocols described above. (*Id.* ¶ 45). If attorneys do not wish to visit in

person, they may have confidential communications with detainees through the detainee telephone or video conference system. (*Id.* ¶ 46).

Officers sanitize all legal visitation areas (both contact and non-contact) before and after each legal visit. (*Id.* ¶ 47). This includes, but is not limited to, wiping down chairs, tables, phones, and other surfaces and equipment using disinfectant. (*Id.*).

The transportation of detainees to off-site medical providers has been limited to only essential and/or emergency services. (*Id.* ¶ 48). In the event it is necessary to transport a detainee to an offsite hospital or clinic, staff are required to wear protective gloves and masks throughout the duration of the transport. (*Id.*). If a detainee returns from an outside medical appointment, including from any hospital, they are given the same health screening as all new detainee intakes. (*Id.*). In particular, any detainee who is returning to NSDC from an outside hospital visit, is also assessed by a medical provider who reviews their medical status and will determine medically appropriate actions for care and housing, prior to the detainee returning to their assigned housing location. (*Id.*).

Facility vehicles used at NSDC are subject to enhanced cleaning and disinfecting procedures with recommended antiviral cleaning agents before and after each transport. (*Id.* ¶ 49). All staff who transport detainees to and from NSDC wear gloves and masks. (*Id.* ¶ 50). The Justice Prisoner & Aline Transportation System ("JPATS") has limited the movement of detainees in and out of NSDC. (*Id.* ¶ 51).

### b.   COVID-19 Detection and Testing at NSDC

NSDC has the ability to test any detainee who, based on the clinical judgment of the medical provider, exhibits or reports symptoms associated with COVID-19. (*Id.* ¶ 52). The test utilized by NSDC is an infection (not antibodies) test, and is conducted by way of a nasal swab. (*Id.* ¶ 53). The test is mailed to a third-party lab for processing. (*Id.* ¶ 54). On average, test results are received by NSDC within four days. (*Id.*). All detainees who show symptoms and are tested, are immediately quarantined until the results come back. (*Id.* ¶ 55).

If a test is returned as positive, the detainee is isolated for ten days. (*Id.* ¶ 56). Medical staff who need to treat or interact with a detainee who has tested positive for COVID-19 wear a mask, gloves, gown, and protective eye equipment. (*Id.* ¶ 57). If a detainee is tested, even before results are received, the pod that detainee came from becomes a protective cohort pod. (*Id.* ¶ 58). Currently, no pods are on cohort status. (*Id.*).

The purpose of establishing protective cohorts is to limit contact between the identified vulnerable detainees and the general population and thus eliminate or decrease COVID-19 exposure and infection to those deemed high risk. (*Id.* ¶ 59). Detainees in cohorted housing pods are restricted to their pods and subject to daily medical monitoring for fever and symptoms of respiratory illness. (*Id.* ¶ 60). Any that show signs of fever and/or respiratory illness will be referred to medical. (*Id.*). Cohorting will be discontinued following a 10-day period with no new cases—following the last positive test result. (*Id.*). Unless USMS orders otherwise, no detainees are transferred in or out for ten days. (*Id.*).

Petitioners allege: "When dormitory units are placed on quarantine . . . they are not permitted to go to medical, church, or the recreation/program room." (ECF No. 1 ¶ 53.) This is inaccurate. (Ex. A ¶ 61). Detainees in cohort units are permitted to go to medical. (*Id.*). Medical providers also make rounds within the unit. (*Id.*). Church services have been discontinued since March, but the Chaplain makes rounds inside units. (*Id.*). Detainees in cohort have access to everything in their unit. (*Id.*). For G4 this includes outdoor recreation (three hours a day), law library, three Playstations, and the multi-purpose room. (*Id.*).

Petitioners allege that the only way to receive medical treatment when a unit is on cohort is to call a "man down."  (ECF No. 1 ¶ 58). This is false, as detailed above. (Ex. A ¶ 62).

If a staff member observes or suspects that any detainee at NSDC may be symptomatic of potential COVID-19 infection, staff will immediately refer that detainee to the medical unit for screening. (*Id.* ¶ 63). Any detainee who exhibits such symptoms,

including a fever, will be assessed by a medical provider to determine whether COVID-19 testing is clinically indicated. (*Id.*).

All detainees have been instructed on COVID-19 symptoms and are to report any symptoms to staff immediately. (*Id.* ¶ 64). If NSDC staff are advised of, observe, or suspect that any detainee may be symptomatic of potential COVID-19 infection, staff are instructed to immediately bring the detainee to the medical unit. (*Id.*). If a detainee believes he or she is experiencing an urgent medical condition, which cannot await the sick call process, the detainee is instructed to immediately notify the Detention Officer stationed in that area, who will notify the nursing staff of the medical problem, and nursing will respond appropriately. (*Id.* ¶ 65). Trained staff is available to administer emergency first aid and life-saving techniques. (*Id.*). If it is after normal hours, providers are available on an on-call basis 24/7. (*Id.*). All unit and security staff have been instructed to contact medical personnel immediately if such symptoms are reported or observed. (*Id.* ¶ 66).

All detainee kitchen workers have their temperature taken before entering the kitchen. (*Id.* ¶ 67). If a detainee presents with a fever, they are immediately taken to NSDC's negative air pressure rooms and tested for COVID-19. (*Id.*).

### c.    Personal Hygiene and Personal Protective Equipment

Cloth masks were distributed to detainees beginning on April 17, 2020—without cost. (*Id.* ¶ 68). On May 6, 2020, all detainees received a second mask, which allows them to have a mask at all times—even when one is being laundered. (*Id.*). Detainees are strongly encouraged and reminded to wear their masks. (*Id.*). In conjunction with the distribution of facial masks to the detainee population, unit staff have provided detainees with education on proper wearing, handling, and disposal of masks. (*Id.*).

On July 30, 2020, CoreCivic implemented an Enhanced Mask Plan to increase the number and frequency of detainees who wear masks. (*Id.* ¶ 69). The plan requires detainees to wear a mask when they leave their assigned living area. (*Id.*). Additional postings

29

regarding safe and proper mask usage were distributed to the housing units the same day. (*Id.*). *See* Attachment G (Mask Postings).

If a detainee requests a new mask, they are provided one at no charge. (Ex. A ¶ 70). Upon request, detainees are also provided protective gloves at no charge. (*Id.* ¶ 71).

NSDC staff have long been issued protective gloves as part of universal precautions to reduce the risk of exposure to, or transmission of, any pathogen. (*Id.* ¶ 72). In the normal course of operations, detention staff are required to wear protective gloves when conducting searches of detainees, their cells, and their personal property. (*Id.*). These normal protocols did not change with the onset of COVID-19. (*Id.*).

In addition to being required to wear protective gloves, staff are also required to wear masks at all times. (*Id.* ¶ 73). Staff are instructed that the mask should cover both the mouth and nose and be adjusted by the wearer as frequently as needed to ensure the best coverage of the mouth and nose. (*Id.*). Staff have also been instructed on the re-use and cleaning/laundering of paper and cloth masks per CDC guidelines. (*Id.*).

As of September 15, 2020, NSDC had the following personal protective equipment in stock:

        a.   1560 boxes of gloves (100 gloves to a box);

        b.   8093 body suits;

        c.   230 boot covers;

        d.   235 face shields;

        e.   6358 N95 masks;

        f.   15,870 surgical masks; and

        g.   2000 cotton masks.

(*Id.* ¶ 74). In addition, liquid soap is available in all restroom areas. (*Id.* ¶ 75). Detainees are provided bar soap as well, and may request additional supplies (without limitation and free of charge) upon request. (*Id.*). Additionally, the officer station in each housing pod has a box of soap that detainees may take at their leisure. (*Id.*).

For legitimate and corrections industry-accepted safety and security reasons, detainees are not provided with alcohol-based hand sanitizer, as it is flammable and can be used to make homemade alcohol. (*Id.* ¶ 76). NSDC permits staff to bring in a small amount of alcohol-based hand sanitizer for personal use. (*Id.*). Staff have access to soap and running water at their stations. (*Id.* ¶ 77).

### d.    Enhanced Sanitation Practices

NSDC has enhanced its already robust sanitation practices in response to COVID-19. (*Id.* ¶ 78). All pods and detainee common areas (day rooms, showers, sinks, toilets, library, medical, recreation yards, computer lab, *etc.*) are sanitized each hour (and typically more frequently) from 7:00–22:00. (*Id.* ¶ 79). Detainee workers received additional training regarding the proper use of cleaning supplies to allow for efficient disinfection. (*Id.*).

Detainees in cell pods may request cleaning supplies at any time to clean the inside of their cell. (*Id.* ¶ 80). There is no limit to how frequently detainees can request (and are provided) these supplies. (*Id.*). Each unit's cleaning supply inventory is checked and restocked daily to maintain a sufficient supply on hand. (*Id.* ¶ 81).

The entire facility (including all door handles, crash gates, intake area, front post area, vehicles, *etc.*) is disinfected each day. (*Id.* ¶ 82). Staff are required to dip keys in disinfectant and dry them off with a paper towel before checking them out. (*Id.* ¶ 83). *See* Attachment H (Photograph of Key Cleaning Notice and Station).

Laundry, and other carts used to transport meals or commissary, are disinfected on entry and exit of every housing pod. (Ex. A ¶ 84). All dining areas are cleaned and disinfected before, during, and after all meals. (*Id.* ¶ 85). All medical personnel clean and disinfect their areas after seeing a detainee ensuring that all medical equipment is cleaned and disinfected. (*Id.* ¶ 86). Peroxide, disinfectant wipes, and HDQ disinfecting solution are utilized for the sanitation efforts described above. (*Id.* ¶ 87).

The disinfectants used at NSDC are EPA-registered for use against COVID-19. (*Id.* ¶¶ 87-88). They are not diluted, as Petitioners claim. (ECF No. 1 ¶ 39; Ex. A ¶ 88). Rather,

they come in concentrated form, and are mixed with water according to the manufacturer's specifications. (Ex. A ¶ 88). Staff and detainees are instructed that areas where disinfectants are used must be permitted to air dry. (*Id.*).

### e.   Detainees' Education and Access to Information

Each Tuesday (USMS one week and ICE the next), the Warden and Department Heads (business office, medical, religious services, food services, *etc.*) meet with two detainee designees (these designees change weekly) from each pod to discuss COVID-19 issues, answer questions, and receive detainee feedback. (*Id.* ¶ 89). Such discussions include how to obtain medical services, proper social distancing, sanitation, hand washing, personal hygiene, and exposure-prevention practices. (*Id.*). These meetings facilitate communication between detainees and staff, and allow staff to instill proper hygiene and social distancing practices among the detainee population. (*Id.*). Detainees are also regularly advised via postings throughout the facility, and twice-weekly town hall meetings, to let staff know immediately if they have a fever, chest congestion, or difficulty breathing. (*Id.* ¶ 90).

Additionally, COVID-19 Prevention Plan Notices are posted throughout the facility and within all Housing Pods. (*Id.* ¶ 91). *See* Attachment I (COVID-19 Postings from BA). The Prevention Plan is also reviewed during the weekly meetings. (Ex. A ¶ 91). In the event of a change or addition to COVID-19 protocols or procedures, Change Notices are distributed to all staff. (*Id.* ¶ 92).

### f.   Access to Detainee Health Care and Plans in the Event of Detainee Infection

NSDC has highly security-sensitive and confidential emergency plans for a Medical Emergency and Pandemic Preparedness, as part of its Emergency Response Policy. (*Id.* ¶ 93). The disclosure of the specific details of those plans would pose a safety and security risk to the detainee population, CoreCivic staff, and the public. (*Id.*). The facility also has a staffing contingency plan in the event there are increased staff absences due to COVID-19. (*Id.* ¶ 94).

NSDC has the capacity to effectively quarantine and medically isolate any detainee who is confirmed, presumed, or suspected positive for COVID-19. (*Id.* ¶ 95). There are two negative air pressure rooms in the medical unit and five medical isolation cells where detainees can be medically isolated from the detainee population and most facility staff, while still receiving appropriate medical care. (*Id.*). Should additional space be needed, NSDC has the ability to clear detainees from a housing area, and dedicate that housing area as a cohort or quarantine to limit the exposure to other detainees or staff. (*Id.* ¶ 96).

NSDC is constantly reviewing its contingency plans for confirmed or presumptive COVID-19 positive detainees to promote containment and prevent further exposure and infection. (*Id.* ¶ 97). In the exceptional event that the number of COVID-19 cases reaches high levels, CoreCivic can provide additional support, supplies, or personnel to NSDC, and also make additional unutilized bed space at other CoreCivic facilities available on short notice. (*Id.* ¶ 98). Should a detainee require higher levels of care or monitoring than NSDC can provide, detainees can be transferred to receive higher levels of care or monitoring at Desert View Hospital or additional Las Vegas hospitals, if necessary. (*Id.* ¶ 99).

NSDC has developed and is constantly reviewing its contingency plans for confirmed or presumptive COVID-19 positive detainees. (*Id.* ¶ 100).

**3.   Respondent has taken objectively reasonable measures to protect Petitioners.**

To prevail on their first Fifth Amendment challenge, Petitioners must demonstrate that Respondent failed to provide them with "food, clothing, shelter, medical care, [or] reasonable safety." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). An "objective deliberate indifference standard" applies. *Gordon v. Cty. Of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018); *see also Castro v. Cty. Of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (defendant's conduct must be "objectively unreasonable" to violate the Due Process Clause on a failure-to-protect claim). Specifically, Petitioners must demonstrate: 1) Respondent made an intentional decision concerning Petitioners' conditions of

confinement; 2) those conditions caused a substantial risk of serious harm to Petitioners; 3) Respondent did not implement reasonable measures to abate that risk; and 4) that failure caused Petitioners harm. *Gordon*, 888 F.3d at 1125.

With respect to the third element, Petitioners must show that Respondent's conduct was "objectively unreasonable," a test that will necessarily turn on the facts and circumstances of each particular case. *Id.* "The mere lack of due care by a state official does not deprive an individual of life, liberty, or property" under the Fifth Amendment. *Id.* Thus, a petitioner must prove "more than negligence but less than subjective intent—something akin to reckless disregard." *Id.*

Moreover, a prisoner who brings a deliberate-indifference claim "has a steep hill to climb." *Keohane v. Fla. Dep't of Corr.,* 952 F.3d 1257, 1266 (11th Cir. 2020). The deliberate indifference must rise to the level of an "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). An official may escape liability for known risks if he responded reasonably to the risk, "even if the harm ultimately was not averted." *Swain v. Junior*, 2020 WL 2161317, at *4 (11th Cir. 2006); *see also Jorge V.S. v. Green*, 2020 WL 1921936, at *3 (D.N.J. Apr. 21, 2020) ("Clearly, jail officials are well aware of the risks and dangers posed by COVID-19 and have taken more than adequate steps to alleviate that risk to the best of their ability, and have also directly provided Petitioner treatment … That these steps do not guarantee Petitioner will remain healthy and free of the disease is immaterial, the constitution requires no such perfection.").

Here, the significant measures Respondent has implemented at NSDC in response to the COVID-19 pandemic demonstrate that Respondent has not recklessly disregarded the health and safety of Petitioners or other detainees in his care. Those measures likewise refute Petitioners' claim that they and other detainees face a substantial risk of contracting COVID-19. Petitioners' bald assertions to the contrary, unsubstantiated by evidence, do not entitle them to relief. Moreover, Petitioners conflate "reasonable safety" with "absolute safety" in that they apparently believe their mere presence in NSDC subjects them to a

substantial risk of contracting COVID-19. Nothing in the Fifth Amendment, however, requires Respondent to guarantee that Petitioners will not get COVID-19. *See Dawson v. Asher*, 2020 WL 1704324, at *12 (W.D. Wash. Apr. 8, 2020) ("[U]nder the Fifth Amendment, Respondents are not required to eliminate any risk to Petitioners. Instead, Respondents are required to provide for their 'reasonable safety."); *Keohane v. Fla. Dep't of Corr.*, 952 F.3d 1257, 1266 (11th Cir. 2020) ("The Constitution doesn't require that the medical care provided to prisoners be perfect, the best obtainable, or even very good.").

Further, Petitioners cannot point to any intentional decision that has caused a risk of harm. Even the failure to implement particular measures does not qualify as an "intentional decision." *See Moriarty v. Cty. Of San Diego*, 2019 WL 4643602, at *10 (S.D. Cal. Sept. 24, 2019) (ruling that the "failure to appreciate that he was suicidal was not an 'intentional decision'' under the objective-reasonableness test). Indeed, the actions taken at NSDC confirm that Respondent's intentional decision-making provided a safer environment for Petitioners and the other detainees. *See Morales v. City of N. Las Vegas*, 272 F. Supp. 3d 1216, 1222 (D. Nev. 2017) (concluding that a prison facility's deliberate attempts to protect an inmate evinced plaintiff's failure to show that he was subjected to a substantial risk of harm).

Lastly, Petitioners' allegations of isolated instances in which they claim to have observed facility staff members not following the protocols does not establish that Respondent has been objectively unreasonable, or that he acted in reckless disregard in developing and implementing protocols. *See Lucero-Gonzalez v. Kline*, 2020 WL 2987002, at *10 (D. Ariz. June 2, 2020) ("Although there may be some instances in which Defendants' policies have not been followed … this does not reflect that the policies themselves are objectively insufficient. Rather, it supports only that various staff, detainees, or other individuals—who are not named as Defendants to this action—have failed to comply with Defendants' COVID-19-related policies.").

Indeed, the reasonable efforts Respondent has undertaken to respond to the COVID-19 pandemic are borne out in the medical treatment of Petitioners. Although Petitioners

make various allegations regarding their medical treatment at NSDC, the reality is neither Petitioner ever requested any testing or treatment for COVID-19, and both have been properly assessed for potential COVID-19 symptoms and treatment throughout their detention. NSDC's screening and treatment of Petitioners met and, in one instance exceeded, the protocols established by the CDC. (*See, e.g.* Ex. B at ¶ 23 (detainees who test positive are medically isolated consistent with CDC guidelines); *Id.* at ¶¶ 39, 43 (detainee Kim tested for COVID-19 despite not meeting threshold temperature of 100.4 degrees due to slight fever).

In sum, Petitioners have failed to demonstrate that Respondent responded to the COVID-19 pandemic with deliberate indifference. On the contrary, Respondent has taken reasonable steps to mitigate the risks associated with the pandemic and to protect the safety and well-being of NSDC detainees. Under the circumstances, Petitioners have failed to demonstrate they are at substantial risk of contracting COVID-19 or suffering serious harm. Accordingly, their first Fifth Amendment claim fails and their habeas petition should be denied.

### 4.      Petitioners' conditions of confinement do not qualify as punishment.

To prevail on their second Fifth Amendment challenge, Petitioners must establish that their conditions of confinement amount to punishment. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Petitioners are required to show either an express intent to punish them or the imposition of a restriction or condition that is not reasonably related to a legitimate government objective. *Bell*, U.S. at 539. A presumption of punitive conditions arises only where a petitioner demonstrates that conditions are "identical to, similar to, or more restrictive than, those in which his criminal counterparts are held." *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004). The presumption is rebuttable, however, and may be overcome if the government establishes "legitimate, non-punitive interests justifying the conditions of [the detainee's] confinement" and "that the restrictions imposed … [are] not 'excessive' in relation to these interests." *Id.* at 935.

Here, Petitioners do not allege that the conditions at NSDC are "identical to, similar to, or more restrictive than, those in which his criminal counterparts are held." Nor do they identify any particular criminal detention facility that utilizes different—let alone better—COVID-19 protocols than NSDC. Thus, the presumption does not apply. In any event, the detention of persons charged with crimes serves a legitimate government interest. *See United States v. McDonald*, 2020 WL 1659937, at *3 (D. Nev. Apr. 3, 2020) ("Defendant's detention is reasonably related to legitimate public interests, namely, protecting the community and ensuring his appearance at trial[.]"). Moreover, Respondent has taken extensive steps to mitigate the risk of COVID-19 at NSDC, including measures to prevent the spread of the virus and to provide appropriate medical care to those who may contract it.

In sum, Petitioners' detention at NSDC does not amount to punishment. Indeed, the district court assigned to each Petitioner's criminal case has already considered the facts and competing arguments relating to each individual Petitioner and found compelling reasons not to release them. Thus, continued detention does not amount to punishment because it is reasonably related to non-punitive and legitimate goals. The public interest is also best served by deferring to the orderly protocols and processes implemented by Respondent in addressing COVID-19. *See Youngberg v. Romeo*, 457 U.S. 307, 322-23 (1982) (urging judicial deference and finding presumption of validity regarding decisions of medical professionals concerning conditions of confinement). Accordingly, Petitioners' second Fifth Amendment claim fails and the habeas petition should be denied.

## I.    Petitioners' remaining allegations have no merit.

### 1.    Chief Sapp has acted appropriately in his dealings with NSDC detainees.

Eugene Sapp serves as Chief of Unit Management at NSDC. (Ex. C ¶ 3[5]). Petitioners allege that on May 27, 2020, Chief Sapp informed the G2 Unit population that "at least 60 to 70% of them had asymptomatic COVID-19 and that if they did not have more than 2 or 3 symptoms, including fever, they would not be tested." (ECF No. 1 ¶ 67). Chief Sapp has

---

[5] Exhibit C is the declaration of Eugene Sapp.

testified under oath that he did not make these statements (Ex. C ¶ 4). According to Chief Sapp, he is not a medical professional and he would not have speculated as to which detainees were asymptomatic. (*Id.*). In addition, Petitioners' allegations inaccurately describe CoreCivic's COVID-19 testing protocol. (*Id.*).

Petitioners next allege that on June 9, 2020, Chief Sapp told detainees "'it is what it is' in response to their protests that they had been exposed to a newly arrived infected individual who was not quarantined properly." (ECF No. 1 ¶ 33). According to Chief Sapp's sworn testimony, "This did not happen." (Ex. C ¶ 5).

Lastly, Petitioners allege that on June 10, 2020, multiple G2 Unit detainees told Chief Sapp "that they would report the above exposure to their attorneys" and that he responded: "I hope you have a good lawyer.  I'll be waiting for your lawsuit.  Good luck with that."  (*Id.* at ¶ 34). Chief Sapp has testified under oath that "[t]his conversation never occurred." (Ex. C ¶ 6).

### 2. When quarantined, NSDC detainees are monitored by medical staff.

Petitioners allege that when quarantined, they are watched by correctional staff rather than medical staff. (ECF No. 1 at ¶ 59.)  This is inaccurate. (Ex. A ¶ 35). All detainees in the AA and CA Pods are monitored by medical staff, which includes having their temperature taken twice a day. (*Id.*). In addition, USMS detainees who are experiencing COVID-19 symptoms during the ten-day quarantine period are logged on a Symptom Monitoring Log. (*Id.*).  *See* Attachment F (USMS Symptom Monitoring Log).

### 3. Petitioners have declined opportunities to buy extra soap.

Detainees receive soap from NSDC free of charge and they also are permitted to purchase brand-name soap from the commissary. (Ex. A ¶ 107). While Petitioners purchased brand-name soap on occasion, the majority of their commissary purchases were for food items, indicating they are provided with an ample supply of facility-issued soap. (*Id.* ¶ 108).  *See* Attachment K (Petitioners-Plaintiffs' Commissary Records). Since March

2020, Petitioner Kim purchased brand-name soap seven times and Petitioner Carranza four times. (Ex. A 108).

### 4. NSDC does not utilize a "hole" for infected detainees.

There is no "hole" at NSDC. (*Id.* ¶ 109). There is a restrictive housing unit that has, on occasion, been used for quarantine overflow. (*Id.*). Detainees who have been quarantined in the CA pod are provided with the same basic necessities as other detainees. (*Id.*).

### 5. NSDC did not give an ultimatum to detainees.

Petitioners allege that protective custody ("PC") detainees housed in the heightened-risk COVID-19 pod "were given an ultimatum: sign a waiver agreeing to be housed with general population ("GP"), COVID-19 high-risk inmates or be placed in the hole." (ECF No. 1 at ¶ 38). This is false. (Ex. A ¶ 112). Rather, in August 2020, NSDC restructured several of its housing pods. (*Id.*). The housing pod that was utilized to house heightened-risk detainees (BB), was transitioned to a female pod. (*Id.*). As such, heightened-risk PC detainees were offered the opportunity to be housed in the same housing pod as heightened-risk GP detainees (G4). (*Id.*). They were not required or pressured to do so, nor were they required to sign a waiver. (*Id.*). Instead, as is the procedure for all PC detainees who wish to be moved to a GP housing unit, they were required to advise NSDC of their decision in writing. (*Id.*). If they declined to be housed with PC GP detainees, they were housed in CA with other PC detainees. (*Id.*).

### 6. Pepper spray deployed in BA did not infiltrate BB.

Petitioners allege that pepper spray deployed in BA "infiltrated BB." (ECF No. 1 ¶ 73). That assertion is false. (Ex. A ¶ 37). Every housing pod at NSDC, including the AA and CA pods, has its own ventilation unit. (*Id.*).

/ / /

/ / /

/ / /

/ / /

**CONCLUSION**

For the reasons argued above, the Court should dismiss, and alternatively deny, the Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241.

Respectfully submitted this 17th day of September, 2020.

NICHOLAS A. TRUTANICH
United States Attorney


*s/ Holly A. Vance*
HOLLY A. VANCE
Assistant United States Attorney