# EXHIBIT A

# Declaration of Warden B. Koehn

# DECLARATION OF WARDEN B. KOEHN

I, Warden B. Koehn, hereby state the following based upon my personal knowledge:

1. I am over the age of 18 years and competent to testify to the matters set forth in this Declaration.

2. I am the Warden of Nevada Southern Detention Center ("NSDC") located in Pahrump, Nevada. I have held this position since September 2018. NSDC is owned and operated by CoreCivic pursuant to a correctional services agreement with U.S. Immigration and Customs Enforcement ("ICE") and the United States Marshals Service ("USMS"). NSDC houses both ICE immigration and USMS criminal detainees. These populations are housed separately and do not intermix except under exceptional circumstances.

3. I have been employed by CoreCivic since 1992, starting as a sergeant at CoreCivic's Prairie Correctional Facility. During my career with CoreCivic, I have also served as an assistant shift supervisor, SORT commander, training manager, chief of security, assistant warden, and director of security for CoreCivic's Facility Support Center, and Warden of CoreCivic's Metro-Davidson County Detention Facility. From April 2016 to September 2018, I served as Warden of CoreCivic's Cibola County Correctional Center ("CCCC") located in Milan, New Mexico. Prior to my assignment as Warden of CCCC, I served as Warden of CoreCivic's Florence Correctional Center ("FCC") for approximately 5½ years.

4. Prior to joining CoreCivic, I served for four years in the U.S. Marine Corps, one year in the Marine Corps Reserve, and 11 years in the Army National Guard.

5. I hold a bachelor's degree in elective studies with a focus on criminal justice.

6. I have personal knowledge of the facts set forth in this Declaration, and if called as a witness, could competently testify to these facts.

7. All exhibits attached hereto are true and accurate copies of documents generated and/or maintained in the normal course of NSDC's business operations of which I am familiar with and have reviewed.

8. All photographs attached hereto fairly and accurately depict the subject matter shown in the photographs, as the subject matter existed on September 15, 2020.

**USMS Population Information & Statistics**

9. Neither I as Warden of NSDC, nor CoreCivic, determine which USMS detainees are assigned to NSDC. Rather, assignment decisions are made by USMS. Transfer and release determinations are likewise exclusively made by USMS for their detainee population.

10. While NSDC has the ability to house 784 USMS detainees, on September 15, 2020, the facility was operating at approximately 69% of that capacity, with only 544 USMS detainees.

11. As of September 15, 2020, there was only one COVID-19 case at NSDC. This particular detainee was tested upon admission. She is housed in medical and has had no contact with the detainee population.

**Intake Screening & Efforts to Mitigate Risk of COVID-19 Introduction**

12. CoreCivic recognizes the unique and exceptional nature of the current COVID-19 pandemic, and takes seriously its responsibility to protect the safety and security of the detainees and inmates in its facilities, its staff, its contractors' employees, its governmental partners' employees, and the public as a whole.

13. CoreCivic's Facility Support Center ("FSC"), located in Brentwood, Tennessee, developed company-wide protocols in response to COVID-19, which are implemented at the facility level based on each facility's unique population, physical plant, and safety and security concerns. FSC provides ongoing guidance and instruction to its facilities, including NSDC, consistent with recommendations of the Centers for Disease Control and Prevention ("CDC") and its governmental partners, as well as state and local health authorities where its facilities are located. As additional recommendations are made in consideration of localized health conditions, practices to prevent the spread of COVID-19 at NSDC have evolved, with changes occurring sometimes on a daily basis.

14. FSC has also activated its Emergency Operations Center ("EOC"), which allows for effective communication and guidance to all CoreCivic facilities in a timely manner as to daily developments regarding COVID-19 information, CDC guidance, and developing operational modifications and enhancements.

15. Each week and based upon need, CoreCivic facility administrators with a first COVID-19 positive test or significant change in circumstances participate in a conference call with CoreCivic's EOC to review current and new protocols, receive CDC updates, and discuss additional concerns and requests. CoreCivic facility leaders also participate in a call once a week to discuss new protocols, receive CDC updates, and discuss additional concerns and requests related to the response to COVID-19. Further, all CoreCivic facility administrators have access to an intranet sharepoint site which contains all company-wide information, communications, and updated protocols related to COVID-19.

16. NSDC has its own daily briefing with facility leadership and designated supervisory staff to discuss daily issues and assign tasks associated with COVID-19 operational responses. NSDC's COVID-19 Checklist guides daily responsibilities employed to ensure staff are timely apprised of new developments with respect to COVID-19 exposure and infection risks. Daily responsibilities are assigned to the Warden (or the Administrative Duty Officer); each Shift Supervisor (or designed Assistant Shift Supervisor); Unit Manager; Safety Manager; Health Services Administrator; contracted Food Service Manager; and, Quality Assurance Manager. The purpose of this checklist is to make sure that each of those facility supervisors is timely aware of new developments; is speaking with staff and detainees about following appropriate precautions; encouraging staff and detainees to seek medical care if they feel ill or show signs of illness; monitoring staff and detainees for signs of illness; engaging in ongoing education efforts with staff and detainees; verifying ample supplies of appropriate materials; and, conducting sanitation inspections on a daily basis in their delegated area of responsibility. *See* Attachment A (NSDC COVID-19 Checklist).

17. I am in continual contact with ICE and USMS officials in order to keep NSDC's government partners updated on all protocols and procedures in place at the facility, to report on the status of facility operations and detainee health statistics, and to address any concerns or directives that ICE or USMS may have regarding NSDC operations.

18. The Health Services Administrator is in frequent contact with the Nye County Health Department as well as other local government bodies and officials to provide status updates as to infection rates and to ensure any applicable state and local protocols are met.

19. In February 2020, CoreCivic issued an initial Pandemic Coronavirus plan that has been continually updated as more becomes known about the virus, and additional guidance is provided by the CDC. *See* Attachment B (CoreCivic Pandemic Coronavirus Plan).

20. CoreCivic also initiated a COVID-19 Medical Emergency Plan that has been implemented at all CoreCivic facilities, including NSDC. *See* Attachment C (Medical Emergency: Pandemic Coronavirus (COVID-19) Plan).

21. On approximately March 25, 2020, CoreCivic initiated a Medical Management of COVID-19: Quarantine High Risk Inmates/Detainees plan in order to employ operational strategies for quarantine of those who are at higher risk for contracting COVID-19. *See* Attachment D (Medical Management of COVID-19: Quarantine High Risk Inmates/Detainees in Every Facility and correspondence from Managing Director of Operations D. Berkebile to Wardens dated 3/25/20). Heightened-risk detainees are currently housed in F1.

22. NSDC began taking steps to prevent the introduction of COVID-19 on approximately March 7, 2020.

23. All individuals who wish to enter the facility (including new detainees) are subject to health screening, as a pre-requisite to entrance to the facility. Consistent with CDC Interim Guidance, the screening consists of a screening questionnaire and temperature check. Social distancing is also practiced during the entrance screening process. Staff who conduct intake screening wear PPE and process intake in a manner which allows for physical/social distancing. *See* Attachment E (Photographs of NSDC Lobby).

24. The screening questionnaire consists of the following questions: (1) have they traveled out of the country in the last 10 days; (2) are they are experiencing any symptoms associated with COVID-19; or (3) have they have been in close contact with any person who has tested positive for COVID-19. If a person answers affirmatively to the screening questions, or if

4

the person exhibits symptoms of COVID-19, including a fever in excess of 100.4 degrees, they are denied entry into the facility.

25. If a CoreCivic employee is denied entry, they are sent home and directed to see a healthcare provider for further screening. Those that have been denied entrance must obtain clearance from their medical provider and provide documentation before they will be admitted into the facility. Likewise, if any staff member experiences symptoms at work, that individual is immediately sent home and directed to see a healthcare provider as soon as possible.

26. Out of an abundance of caution, CoreCivic employees who have been denied entry after screening are instructed to self-quarantine at home for 10 days, or until they are symptom free, during which time they will be paid and the leave time will not be charged against the employee's leave balance, provided documentation from a physician indicates the employee sought medical evaluation for COVID-19 exposure. This measure is designed to eliminate any incentive for a potentially infected employee to "tough it out" and attempt to report to work.

27. Following the entrance health screening, persons permitted to access the facility are still required to complete security screening. Only one person may enter security screening at a time. Generally, the security screening resembles most airport security screenings, where items carried by, or to be removed from, a person screened are placed in bins and sent through a scanner. At NSDC, officers that manage the scanners disinfect the bins regularly throughout the day. They also wear protective gloves such that only the owners of the items screened touch the property with ungloved hands.

28. When detainees arrive at the facility, their temperature is taken when they exit the transport vehicle.

29. They are then taken to a medical exam room in intake, where an extensive medical history workup is completed, which includes being questioned regarding possible COVID-19 exposure, vulnerability, and symptoms, as described above. Their temperature is then taken again.

30. If a detainee reports any possible exposure, or exhibits any of the symptoms associated with COVID-19, they are immediately taken to medical to be assessed for COVID-19 testing.

31. If an incoming detainee passes the screening procedures described above, they are housed in either the AA or CA Pod where (absent exceptional circumstances) they are quarantined for ten days.

32. AA Pod can house 136 detainees. CA Pod can house 103 detainees. This allows each arrival group to be separated from other groups who are also subject to the ten-day quarantine period. Arrival groups do not mix.

33. For example, if eight detainees arrived on September 1, and two arrived on September 6, the eight detainees would be celled with each other (two to a cell) and the two detainees would be celled together. They would only be permitted out of their cell at the same time as others they arrived with.

34. This prevents one arrival group from coming in contact with another arrival group.

35. I understand Petitioners allege that when quarantined, they are treated by correctional staff rather than medical staff. (Dkt. 1 at ¶ 59.) This is inaccurate. All detainees in AA and CA Pods are monitored by medical staff, which includes having their temperature taken twice a day. USMS detainees who experience COVID-19 symptoms during the ten-day quarantine period are logged on a Symptom Monitoring Log. *See* Attachment F (USMS Symptom Monitoring Log).

36. When quarantined, detainees have access to a law library and telephones. The quarantine units (AA or medical) also show movies. Pursuant to CoreCivic policy, all detainees in restrictive housing units are escorted in handcuffs while in the unit, including those on quarantine status. If a detainee is quarantined in medical, or is moved outside a restrictive housing unit, this policy would not apply.

37. Every housing pod at NSDC, including AA and CA, has its own ventilation unit. Petitioners' allegation that pepper spray deployed in BA "infiltrated BB" is false. (Dkt. 1 at ¶ 73.)

6

38. Detainees are regularly advised of the importance of social distancing and are reminded to stay six feet apart by staff during their rounds.

39. To reduce the possibility of cross-contamination, officers are assigned to a primary post and, with limited exceptions, work the same unit each day. Staff who work in quarantined units do not work in other units.

40. All programs were canceled to allow for social distancing. Program packets are now distributed to detainees in their housing pods.

41. NSDC provides satellite feeding (meals are brought to detainees inside their housing pods) in all housing pods. For celled pods, detainees are fed in their cells. For dormitory pods, detainees retrieve their food tray inside the pod and are permitted to eat in the dayroom or at their bunk. Disposable Styrofoam trays are now used for all meals.

42. I understand Petitioners claim that unidentified detainees are being denied access to "programming; communication with their attorneys, other professionals, families, and friends; outside medical services; and public safety information." (Dkt. 1 at 7.) This is inaccurate.

43. While NSDC has placed a hold on all social visits (such as visits from friends and family) to limit the number of people entering the facility and interacting with detainees, a video message program was implemented on September 1, 2020, whereby detainees are afforded the opportunity to send video messages to their friends and family. Additionally, detainees are able to utilize the mail and telephone to communicate with their loved ones.

44. Prior to COVID-19, no telephone calls were free. As a result of COVID-19, the USMS permitted one free call a week, for a maximum of 20 minutes. Additionally, CoreCivic expanded the ability to purchase phone time from once to twice a week. Local telephone calls are 10 cents a minute. Out of state calls are 21 cents per minute. I understand Petitioners allege there are only five telephones in the G4 Unit for "around 90 people." (Dkt. 1 at ¶ 49.) This is incorrect. There are six telephones. On September 15, 2020, the population of G4 was 61.

45. Face-to-face legal visits are generally suspended, although such visits will be permitted on a case-by-case basis after the attorney is screened for infection in accordance with screening protocols described above.

7

46. If attorneys do not wish to visit in person, they may have confidential communications with detainees through the detainee telephone or video conference system.

47. Officers sanitize all legal visitation areas (both contact and non-contact) before and after each legal visit. This includes, but is not limited to, wiping down chairs, tables, phones, and other surfaces and equipment using disinfectant.

48. The transportation of detainees to off-site medical providers has been limited to only essential and/or emergency services. In the event it is necessary to transport a detainee to an offsite hospital or clinic, staff are required to wear protective gloves and masks throughout the duration of the transport. If a detainee returns from an outside medical appointment, including from any hospital, they are given the same health screening as all new detainee intakes. In particular, any detainee who is returning to NSDC from an outside hospital visit, is also assessed by a medical provider who reviews their medical status and will determine medically appropriate actions for care and housing, prior to the detainee returning to their assigned housing location.

49. Facility vehicles used at NSDC are subject to enhanced cleaning and disinfecting procedures with recommended antiviral cleaning agents before and after each transport.

50. All staff who transport detainees to and from NSDC wear gloves and masks.

51. The Justice Prisoner & Aline Transportation System ("JPATS") has limited the movement of detainees in and out of NSDC.

**COVID-19 Detection and Testing at NSDC**

52. NSDC has the ability to test any detainee who, based on the clinical judgment of the medical provider, exhibits or reports symptoms associated with COVID-19.

53. The test utilized by NSDC is an infection (not antibodies) test, and is conducted by way of a nasal swab.

54. The test is mailed to a third-party lab for processing. On average, test results are received by NSDC within four days.

55. All detainees who show symptoms, and are tested, are immediately quarantined until the results come back.

56. If a test is returned as positive, the detainee is isolated for ten days.

8

57. Medical staff who need to treat or interact with a detainee who has tested positive for COVID-19 wear a mask, gloves, gown, and protective eye equipment.

58. If a detainee is tested, even before results are received, the pod that detainee came from becomes a protective cohort pod. Currently, no pods are on cohort status.

59. The purpose of establishing protective cohorts is to limit contact between the identified vulnerable detainees and the general population and thus eliminate or decrease COVID-19 exposure and infection to those deemed high risk.

60. Detainees in cohorted housing pods are restricted to their pods and subject to daily medical monitoring for fever and symptoms of respiratory illness. Any that show signs of fever and/or respiratory illness will be referred to medical. Cohorting will be discontinued following a 10-day period with no new cases, following the last positive test result. Unless USMS orders otherwise, no detainees are transferred in or out for ten days.

61. I understand Petitioners allege that "[w]hen dormitory units are placed on quarantine . . . they are not permitted to go to medical, church, or the recreation/program room." (Dkt. 1 at ¶ 53.) This is inaccurate. Detainees in cohort units are permitted to go to medical. Medical providers also make rounds within the unit. Church services have been discontinued since March, but the Chaplain makes rounds inside units. Detainees in cohort have access to everything in their unit. For G4 this includes outdoor recreation (three hours a day), law library, three Playstations, and the multi-purpose room.

62. I understand Petitioners allege that the only way to receive medical treatment when a unit is on cohort is to call a "man down." (*Id*. at ¶ 58.) This is false, as detailed above.

63. If a staff member observes or suspects that any detainee at NSDC may be symptomatic of potential COVID-19 infection, staff will immediately refer that detainee to medical for screening. Any detainee who exhibits such symptoms, including a fever, will be assessed by a medical provider to determine whether COVID-19 testing is clinically indicated.

64. All detainees have been instructed on COVID-19 symptoms and are to report any symptoms to staff immediately. If NSDC staff are advised of, observe, or suspect that any

9

detainee may be symptomatic of potential COVID-19 infection, staff are instructed to immediately bring the detainee to medical.

65. If a detainee believes he or she is experiencing an urgent medical condition, which cannot await the sick call process, the detainee is instructed to immediately notify the Detention Officer stationed in that area, who will notify the nursing staff of the medical problem, and nursing will respond appropriately. Trained staff is available to administer emergency first aid and life saving techniques. If it is after normal hours, providers are available on an on-call basis 24/7.

66. All unit and security staff have been instructed to contact medical personnel immediately if such symptoms are reported or observed.

67. All detainee kitchen workers have their temperature taken before entering the kitchen. If a detainee presented with a fever, they would immediately be taken to NSDC's negative air pressure rooms and tested for COVID-19.

### Personal Hygiene and Personal Protective Equipment

68. Cloth masks were distributed to detainees beginning on April 17, 2020, without cost. BB Pod was the first to receive them. On May 6, 2020, all detainees received a second mask, which allows them to have a mask at all times, even when one is being laundered. Detainees are strongly encouraged and reminded to wear their masks. In conjunction with distribution of facial masks to the detainee population, unit staff have provided detainees with education on proper wearing, handling, and disposal of masks.

69. On July 30, 2020, CoreCivic implemented an Enhanced Mask Plan to increase the number and frequency of detainees who wear masks. The plan requires detainees to wear a mask when they leave their assigned living area. Additional postings regarding safe and proper mask usage were distributed to the housing units the same day. *See* Attachment G (Mask Postings).

70. If a detainee requests a new mask, they are provided one at no charge.

71. Upon request, detainees are also provided protective gloves at no charge.

72. NSDC staff have long been issued protective gloves as part of universal precautions to reduce the risk of exposure to or transmission of any pathogen. In the normal course of operations, detention staff are required to wear protective gloves when conducting

searches of detainees, their cells, and their personal property. These normal protocols did not change with the onset of COVID-19.

73. In addition to being required to wear protective gloves, staff are also required to wear masks at all times. Staff are instructed that the mask should cover both the mouth and nose and be adjusted by the wearer as frequently as needed to ensure the best coverage of the mouth and nose. Staff have also been instructed on re-use and cleaning/laundering of paper and cloth masks per CDC guidelines.

74. As of September 15, 2020, NSDC had the following Personal Protective Equipment ("PPE") stock:

   a. 1560 boxes of gloves (100 gloves to a box);
   b. 8093 body suits;
   c. 230 boot covers;
   d. 235 face shields;
   e. 6358 N95 masks;
   f. 15,870 surgical masks; and
   g. 2,000 cotton masks.

75. Liquid soap is available in all restroom areas. Detainees are also provided bar soap, and may request additional supplies (without limitation and free of charge) upon request. Additionally, the officer station in each housing pod has a box of soap that detainees may take at their leisure.

76. For legitimate and corrections industry-accepted safety and security reasons, detainees are not provided with alcohol-based hand sanitizer, as it is flammable and detainees consume it due to the alcohol content. NSDC permits staff to bring in a small amount of alcohol-based hand sanitizer for personal use.

77. Staff have access to soap and running water at their stations.

**Enhanced Sanitation Practices**

78. NSDC has enhanced its already robust sanitation practices in response to COVID-19.

11

79. All pods and detainee common areas (day rooms, showers, sinks, toilets, library, medical, recreation yards, telephones, computer lab, etc.) are sanitized each hour (and typically more frequently) from 7:00–22:00. Detainee workers received additional training regarding the proper use of cleaning supplies to allow for efficient disinfection.

80. Detainees in cell pods may request cleaning supplies, at any time, to clean the inside of their cell. There is no limit to how frequently detainees can request (and are provided) these supplies.

81. Each unit's cleaning supply inventory is checked and restocked daily to maintain sufficient supply on hand.

82. The entire facility (including all door handles, crash gates, intake area, front post area, vehicles, etc.) is disinfected each day.

83. Staff are required to dip keys in disinfectant and dry them off with a paper towel before checking them out. *See* Attachment H (Photographs of Key Cleaning Notice and Station).

84. Laundry, and other carts used to transport meals or commissary, are disinfected upon entry and exit of every housing pod.

85. All dining areas are cleaned and disinfected before, during, and after all meals.

86. All medical personnel clean and disinfect their areas after seeing a detainee ensuring that all medical equipment is cleaned and disinfected, as well.

87. Peroxide, disinfectant wipes, and HDQ disinfecting solution are utilized for the sanitation efforts described above. The disinfectants used at NSDC are EPA-registered for use against COVID-19.

88. I understand Petitioners allege the cleaning solutions used at NSDC are diluted. This is false. The disinfectants used at NSDC are EPA-registered for use against COVID-19. They are not diluted. Rather, they come in concentrated form, and are mixed with water according to the manufacturer's specifications. Staff and detainees are instructed that areas where disinfectants are used must be permitted to air dry.

**Detainees' Education & Access to Information**

89. Each Tuesday (USMS one week and ICE the next), the Warden and Department Heads (business office, medical, religious services, food services, etc.) meet with two detainee designees (these designees change weekly) from each pod to discuss COVID-19 issues, answer questions, and receive detainee feedback. Such discussions include how to obtain medical services, proper social distancing, sanitation, hand washing, personal hygiene, and exposure prevention practices. These meetings facilitate communication between detainees and staff, and allow staff to instill proper hygiene and social distancing practices among the detainee population.

90. Detainees are also regularly advised via postings throughout the facility and twice-weekly town hall meetings to let staff know immediately if they have a fever, chest congestion, or difficulty breathing.

91. Additionally, COVID-19 Prevention Plan Notices are posted throughout the facility and within all Housing Pods. *See* Attachment I (COVID-19 Postings from G4). The Prevention Plan is also reviewed during the weekly meetings.

92. In the event of a change or addition to COVID-19 protocols or procedures, Change Notices are distributed to all staff.

**Access to Detainee Health Care and Plans in the Event of Detainee Infection**

93. NSDC has highly security-sensitive and confidential emergency plans for a Medical Emergency and Pandemic Preparedness, as part of its Emergency Response Policy. The disclosure of the specific details of those plans would pose a safety and security risk to the detainee population, CoreCivic staff, and the public.

94. The facility has a staffing contingency plan in the event there are increased staff absences due to COVID-19.

95. NSDC has capacity to effectively quarantine and medically isolate any detainee who is confirmed, presumed, or suspected positive for COVID-19. There are two negative air pressure rooms in the medical unit and five medical isolation cells where detainees can be medically isolated from the detainee population and most facility staff, while still receiving appropriate medical care.

96. Should additional space be needed, NSDC has the ability to clear detainees from a housing area, and dedicate that housing area as a cohort or quarantine to limit the exposure to other detainees or staff.

97. NSDC is constantly reviewing its contingency plans for confirmed or presumptive COVID-19 positive detainees to promote containment and prevent further exposure and infection.

98. In the exceptional event that the number of cases of COVID-19 reach levels beyond those, CoreCivic can provide additional support, supplies, or personnel to NSDC, and also make additional unutilized bed space at other CoreCivic facilities available on short notice.

99. Should a detainee require higher levels of care or monitoring than NSDC can provide, detainees can be transferred to receive higher levels of care or monitoring at Desert View Hospital or additional Las Vegas hospitals, if necessary.

100. NSDC has developed and is constantly reviewing its contingency plans for confirmed or presumptive COVID-19 positive detainees.

**Petitioner Carranza**

101. Petitioner Carranza has been housed in G4 Pod since March 25, 2020.

102. While G4 has the ability to house 96 detainees, on September 15, 2020, the facility was operating at approximately 63% of that capacity, with only 61 detainees.

**Petitioner Kim**

103. Petitioner Kim has been housed in G4 since July 22, 2020.

**NSDC Grievance Process**

104. Policy 14-100 outlines NSDC's Grievance Policy and Procedure. *See* Attachment J (Policy 14-100). Policy 14-100 was in effect at all times relevant to Petitioners' claims.

105. On June 29, 2020, Petitioner Kim submitted a grievance alleging the soap dispenser was broken in G4 Pod. *See* Attachment K (June 29, 2020 Grievance). In response, staff indicated that the dispenser was fixed the next day and that a review of the security footage showed a full box of soap under the officer's podium for detainees to freely take. (*Id.*) Other than this grievance, he has not submitted any other grievances regarding COVID-19 or the allegations in the Petition, including those in Paragraphs ¶¶ 23 –25.

14

106. Petitioner Carranza did not file any grievances regarding COVID-19 or the allegations in the Petition.

**Additional Allegations in Petition**

107. In addition to the standard soap that is provided to detainees free of charge, they may also choose to purchase brand-name soap from the commissary. In preparation of making this Declaration, I reviewed Petitioners-Plaintiffs commissary records. *See* Attachment L (Petitioners-Plaintiffs' Commissary Records).

108. While Petitioners purchased brand-name soap on occasion, the majority of their commissary purchases were for food items—indicating they are provided with an ample supply of facility-issued soap. Since March 2020, Petitioner Kim purchased brand-name soap seven times and Petitioner Carranza four times.

109. There is no "hole" at NSDC. There is a restrictive housing unit that has, on occasion, been used for quarantine overflow. Currently, there are no detainees quarantined in CA. Detainees in CA are provided with the same basic necessities as other detainees.

110. I understand Petitioners' Petition contains various allegations regarding unidentified detainees and staff. Without more information, I am unable to respond or investigate these vague assertions.

111. Petitioners' Petition contains various allegations regarding particular staff members who have allegedly tested positive for COVID-19. Pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"), I cannot confirm, deny, or further comment on these allegations.

112. I understand Petitioners allege that protective custody ("PC") detainees housed in the heightened-risk COVID-19 pod "were given an ultimatum: sign a waiver agreeing to be housed with general population ("GP"), COVID-19 high-risk inmates or be placed in the hole." (Dkt. 1 at ¶ 38.) This is false. Rather, in August 2020, NSDC restructured several of its housing pods. The housing pod that was utilized to house heightened-risk detainees (BB), was transitioned to a female pod. As such, heightened-risk PC detainees were offered the opportunity to be housed in the same housing pod as heightened-risk GP detainees (F1). They were not required or

pressured to do so, nor were they required to sign a waiver.  Rather, as is the procedure for all PC detainees who wish to be moved to a GP housing unit, they were required to advise NSDC of their decision in writing.  If they declined to be housed with PC GP detainees, they were housed in CA with other PC detainees.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 16th day of September, 2020.

_____
WARDEN B. KOEHN