# EXHIBIT B

# Declaration of Dr. K. Ivens

## DECLARATION OF K. IVENS, M.D., F.A.C.C.P.

I, K. Ivens, M.D., make the following Declaration:

1. I am over the age of 18 years and competent to testify to the matters set forth in this Declaration.

2. I have personal knowledge of the facts set forth in this Declaration, and if called as a witness, could testify competently thereto.

3. I am a Medical Doctor, and am currently licensed to practice medicine in Tennessee, Arizona, California, Indiana, Michigan, Mississippi, Colorado, Kansas, Montana, Wyoming, New Jersey, Ohio, New Mexico, and Oklahoma.

4. I hold an undergraduate degree from Michigan State University in Physiology. I performed my graduate studies at Howard University, Department of Anatomy, in cell and molecular biology. My main focus was working as a biochemist developing antibodies for research in different disease states. I received my medical degree from Stanford University School of Medicine. I did my surgical residency at the University of Southern California from 1992-1995.

5. I am past President of the American College of Correctional Physicians and am on the Board of Trustees of the National Commission of Correctional Health Care. I am on the Board of Directors of the Correctional Medical Institute, the Academy of Correctional Healthcare Professionals, and the American Telemedicine Association. I am a Fellow of the American College of Correctional Physicians.

6. I have been actively providing health care to inmates and detainees in jails, prisons, and detention facilities since 1995. I have held such positions as Medical Director for the Indiana Department of Corrections; Western Regional Medical Director for Prison Health Services, at Alameda County Jail; and, East Coast Medical Director for Departments of Correction of Delaware, Maine, Massachusetts and Vermont. I served as Regional Medical Director for Correctional Medical Services (CMS) in the states of Tennessee, Mississippi, and Michigan. While with CMS, I was also the utilization physician coordinating pharmacy and off-site care delivery for over 300,000 inmates and detainees nationwide. After joining CoreCivic in 2007 as a regional medical director, I worked in facilities serving inmates and detainees from California, Arizona, Washington,

1  Idaho, Kansas, Oklahoma, and Colorado. I have worked in and served federal contracts with the
2  Bureau of Prisons, U.S. Marshall Service, and Immigration and Customs Enforcement. In addition
3  to the above, I have worked in other county jails and juvenile detention centers. (*See* Curriculum
4  Vitae of K. Ivens, M.D., at Attachment 1.)

5      7.      I have been employed by CoreCivic, Inc. since 2007. From 2007–2014, I served as
6  CoreCivic's Regional Medical Director, overseeing the provision of medical care to the detainee
7  and inmate populations at several CoreCivic facilities, including the Nevada Southern Detention
8  Center ("NSDC").

9      8.      I am currently the Chief Medical Officer ("CMO") for CoreCivic, a position I have
10  held since 2014. As CMO, I oversee the medical services at 71 jail, detention, correctional, and re-
11  entry facilities throughout the United States, including NSDC.

12      9.      As the CMO for CoreCivic, I am familiar with the appropriate methods to treat and
13  contain contagious illness in a detention setting, including tuberculosis, influenza, mumps, measles,
14  varicella, scabies, and COVID-19.

15      10.      Since the outbreak of COVID-19, I have been working closely with infectious
16  disease specialists and correctional medical professionals on the most up-to-date protocols and
17  practices to prevent the spread of this illness in the jails, detention centers and correctional facilities
18  owned and/or operated by CoreCivic. This also includes monitoring updates and information from
19  the Centers for Disease Control and Prevention ("CDC"), which updates statistical information on
20  a daily basis and promulgates appropriate protocols for managing this illness in a detention setting.
21  I monitor the CDC information on a daily basis.

22      11.      I am responsible for ensuring the overall practices and procedures at the Medical
23  Units in facilities where CoreCivic provides health care—including NSDC—are in compliance
24  with evolving CDC guidelines and recommendations, including intake screening, quarantine,
25  isolation, cohorting measures, personal protection equipment ("PPE"), COVID-19 testing, and
26  treatment for detainees who test positive for the virus.

27      12.      CDC statistics show that the overwhelming number of COVID-related deaths
28  occur in those over the age of 65. CDC data as of September 9, 2020 shows that 79% of all deaths

2

involving COVID-19 occurred in individuals over the age of 65; while only 5.3% of COVID-related deaths occurred within the 45-54 age group. *See* https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#AgeAndSex, last accessed September 14, 2020.

13. Recently, the CDC estimated that the number of unreported cases for every reported case of COVID-19 could be as high as 10 to 1. As a result, previously reported hospitalization rates and death rates are far lower than initially thought. This also indicates that the number of people infected with COVID-19 and displaying symptoms is lower than previously reported. *See* https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/, last accessed September 14, 2020.

**COVID-19 Testing and Treatment**

14. COVID-19 symptoms include the following:
- fever or chills
- cough
- shortness of breath or difficulty breathing
- fatigue
- muscle or body aches
- headache
- new loss of taste or smell
- sore throat
- congestion or runny nose
- nausea or vomiting
- diarrhea

(*See* https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html, last accessed Sept. 14, 2020.)

15. These are also symptoms of many other conditions, including but not limited to seasonal flu and the common cold. As such, CoreCivic has developed approved protocols for facility nursing staff to determine whether referral to a licensed independent provider ("LIP"), such as a physician or nurse practitioner, is necessary.

3

16. After a referral from nursing staff, LIPs evaluate detainees and determine whether testing for COVID-19 is necessary based on their verifiable symptoms, medical histories, and other factors based on the LIPs' education, training, experience, and CDC guidelines.

17. If a detainee has a fever greater than 100.4 degrees, CoreCivic policy is to test the detainee for COVID-19 unless there are no other symptoms of COVID-19 present or there is an apparent source of infection other than COVID-19 that could be causing the high temperature. In that event, the detainee would be treated for the underlying condition first, after which they would be re-evaluated for COVID-19 symptoms to determine whether testing for COVID-19 is necessary.

18. This does not mean that a detainee must have a fever of 100.4 degrees or higher to be tested for COVID-19. Rather, it is one factor LIPs consider in determining whether, in their clinical judgment, such testing is necessary.

19. CoreCivic does not test detainees for COVID-19 upon request, but does so only according to the procedures outlined above.

20. When a detainee is tested for COVID-19, they are moved to medical isolation to limit the spread of the disease while their results are pending. If their test comes back positive, they remain in medical isolation for at least 10 days from the date of the test.

21. There are no vaccines or cures for COVID-19. All detainees who test positive for COVID-19, or are awaiting test results, are treated according to existing clinical criteria with acetaminophen or ibuprofen (to reduce fever and for headaches and other body aches), fluids, and rest, and are evaluated by nursing staff (including temperature checks) twice per day. If hospitalization is required, NSDC has the ability to transport detainees to Desert View Hospital in Pahrump.

22. CoreCivic does not re-test detainees to determine whether they are ready to return to the general population, as tests can remain positive for up to three months after the detainees first test positive, well after the detainees have stopped being contagious. (*See* https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html, last accessed Sept. 14, 2020.) For this reason, the CDC generally does not recommend re-testing persons who previously tested positive for COVID-19 within three months after the date of symptom onset for the initial infection. (*Id*.)

23. Instead, CoreCivic keeps the detainee isolated for at least 10 days, releasing them to general population when they have been without symptoms for three days without medications. This is consistent with CDC guidelines, which allow medical isolation to be discontinued when (1) at least 10 days have passed since symptoms first appeared (or since the first positive test if the detainee is asymptomatic), (2) at least 24 hours have passed since the last fever without the use of fever-reducing medications, and (3) symptoms have improved. (*See* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html, last accessed Sept. 14, 2020.)

### Review of NSDC Detainee Medical Records

24. I am familiar with Petitioners' allegations regarding their medical conditions as stated in the Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Complaint for Declaratory and Injunctive Relief. I have reviewed Petitioners' NSDC medical files and provide the following opinions.

### Detainee Carranza

25. Detainee Carranza is a 37-year-old male who alleges he has type 1 diabetes and high blood pressure, and that these conditions increase his risk of severe illness from COVID-19. He further alleges he suffered symptoms including head and body aches, shortness of breath, and dry cough in early July 2020, and that he repeatedly requested to be tested for COVID-19, but that his requests were denied testing because he did not have a fever of at least 100.4 degrees.

26. I have had an opportunity to review the medical records of Detainee Carranza. He has type 2 diabetes (non-insulin-dependent), as well as high blood pressure. Although type 2 diabetes is recognized by the CDC as a condition that places a person at higher risk of severe illness from COVID-19, and high blood pressure is recognized by the CDC as a condition that may place a person at higher risk of severe illness from COVID-19, Detainee Carranza has not suffered any such illness at NSDC.

27. Since his arrival at NSDC in December 2019, Detainee Carranza has been seen by medical staff each time he has requested it.

28.     On June 13, 2020, Detainee Carranza was seen by Dr. Saavedra in the Diabetic Chronic Care Clinic ("CCC"). He did not have a fever or report any other symptoms at that time, and his lungs were normal. Dr. Saavedra reviewed Detainee Carranza's Accuchecks and diagnosed Detainee Carranza as having fair control of his diabetes (meaning his labs were less than two percentage points above the normal range), and that his condition was "unchanged/stable." Dr. Saavedra ordered further lab tests, adjusted Detainee Carranza's medications, advised him to keep exercising and avoid sugars, referred him to an eye specialist for a diabetic eye exam, and scheduled him to return to the CCC in three months.

29.     That same day, Detainee Carranza was seen by Dr. Saavedra in the Cardiac Chronic Care Clinic for his high blood pressure. He did not have a fever or report any other symptoms at that time, and his lungs were normal. His blood pressure was within the "goal" limits for a patient under 60 years of age, and "unchanged" since his last CCC visit. Dr. Saavedra recommended that Detainee Carranza continue to exercise and limit his salt intake, prescribed an additional blood pressure medication, and ordered that he have his blood pressure checked once a week for three months.

30.     On July 4, 2020, Detainee Carranza was evaluated by Nurse Powers for his complaint of "catching a cold," which he reported had started two days before. He did not have a fever, and did not report fatigue, headache, chills/fever, congestion/runny nose, cough, or pain. Nor did he have labored breathing, shortness of breath, or diminished lung sounds. Pursuant to the approved protocol, Nurse Powers recommended CCP Caffeine Free ("CCP"), a cold medication that is a combination of an expectorant (to loosen mucus in the lungs), a decongestant, and acetaminophen (for pain and fever), twice a day for four days (which Dr. Rivas authorized), and told Detainee Carranza to return to sick call if his symptoms persisted.

31.     Detainee Carranza, however, refused his evening dose of CCP on July 5, and did not report to pill call for his morning dose of CCP on July 6, 7, or 8, 2020.

32.     On July 9, 2020, Detainee Carranza was evaluated by Nurse Krueger in his housing unit in response to complaints of shortness of breath. When Detainee Carranza approached the nurse without a facemask, she asked him to put one on, but he responded that he could not breathe

with it on. Detainee Carranza otherwise denied any shortness of breath, and his respirations were even and non-labored. He reported he felt well, and denied any other symptoms.

33. Detainee Carranza's symptoms on July 4 and July 9, 2020 did not warrant testing for COVID-19. He did not submit any other written Sick Call Requests for symptoms related to COVID-19 or asking to be tested for COVID-19 in July 2020, or at any time since then. Facility nursing staff responded promptly and appropriately to all Sick Call Requests he did submit during that timeframe.

34. In my opinion, Detainee Carranza's health conditions are being appropriately controlled at NSDC.

**Detainee Kim**

35. Detainee Kim is a 31-year-old male who alleges he tested positive for COVID-19, was kept in medical isolation for 14 days, and was returned to his housing unit without being re-tested. He further alleges that, in early July, he collapsed on the floor in medical after he tested positive, and that his symptoms included fever, chest pains, dry mouth, fatigue, head and body aches, difficulty breathing, stiff joints, lock jaw, and that his arms and legs were "seizing up." Detainee Kim alleges he had to be picked up off the floor and placed in a wheelchair to be taken to medical isolation, and that staff did not give him any medicine to treat his symptoms or schedule him to see a doctor while he was in isolation.

36. I have had an opportunity to review the medical records of Detainee Kim. He has no history of any conditions that place him at increased risk of severe illness from COVID-19 pursuant to CDC guidelines, and he has suffered no such illness.

37. On July 4, 2020, Detainee Kim was evaluated by Nurse Powers for his complaint of "catching a cold," which he reported had started two days before. He reported congestion, sneezing, and headache, but did not have a fever at that time, and did not report fatigue, chills/fever, congestion, cough, or pain. Nor did he have labored breathing, shortness of breath, or diminished lung sounds. Pursuant to the approved protocol, Nurse Powers recommended CCP twice a day for four days (which Dr. Rivas authorized), and told Detainee Kim to return to sick call if his symptoms persisted.

1       38.     Detainee Kim, however, refused his morning dose of CCP on July 5, and was
2  inconsistent in taking it over the next three days, taking only his evening dose on July 5 and his
3  morning and evening doses on July 7, 2020.
4       39.     On July 6, 2020, Health Services Administrator ("HSA") Holley evaluated Detainee
5  Kim in his housing unit, and noted he had a temperature of 99.6 degrees. Detainee Kim was then
6  taken to medical, where he denied having any symptoms and said his temperature was probably
7  due to the fact that he was wearing three shirts at the time his temperature was taken. Nevertheless,
8  Detainee Kim was tested for COVID-19.
9       40.     On July 8, 2020, Detainee Kim was confirmed positive for COVID-19.
10      41.     On July 9, 2020, Detainee Kim reported to Nurse Practitioner ("NP") Peterson that
11  he felt well, and he denied fever, chills, cough, and shortness of breath and complained to NP
12  Peterson that he was singled out for testing, while other detainees in his pod were not tested.
13      42.     On July 20, 2020, Detainee Kim was seen by Dr. Rivas. He denied having any
14  symptoms whatsoever while in isolation, and specifically denied any fever, chills, chest pain,
15  shortness of breath, changes in taste or smell, or other pertinent symptoms. He reported having no
16  concerns at that time. Dr. Rivas therefore cleared Detainee Kim to return to his housing unit, but
17  did not order that he be re-tested consistent with the procedures outlined above.
18      43.     Detainee Kim's symptoms on July 4, 2020 did not warrant testing for COVID-19.
19  He has not submitted any written Sick Call Requests since then for symptoms related to COVID-
20  19 or for any other purpose. There is no record in his medical file of his having collapsed on the
21  floor and being placed in a wheelchair at any time before or after he tested positive for COVID-19.
22  If that had occurred, a progress note detailing the medical care he received as a result would have
23  been created in his medical file.
24      44.     There is no evidence that Detainee Kim has suffered any form of severe illness—or
25  any symptoms of any sort other than a mild fever—from COVID-19, including residual issues. He
26  has no history of any medical conditions that place him at increased risk. Although it is not yet
27  clear that a person cannot contract COVID-19 for a second time after recovering from it once, it is
28  also not clear that a person can do so.

45. In my opinion, Detainee Kim's health conditions are being appropriated controlled at NSDC.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct to the best of my knowledge.

EXECUTED this 14th day of September 2020 at San Diego, California.

*/s/ Keith Ivens, M.D.*

K. IVENS, M.D.

9

# Attachment 1

*Curriculum Vitae*

# Keith W. Ivens, MD, ACCP

_____

| | |
|---|---|
| **Position** | Chief Medical Officer, CoreCivic |
| | President, Correctional Medicine Associates, PC |
| **Office Address** | 5501 Virginia Way |
| | Brentwood, TN 37207 |
| | (615) 263-3277 |
| | Keith.Ivens@corecivic.com |

**Medical Licenses**

| | |
|---|---|
| California | G079310 |
| Indiana | 01044224-A |
| Tennessee | MD36733 |
| Mississippi | 18235 |
| Michigan | 4301085294 |
| Arizona | 37806 |
| Oklahoma | 28157 |
| Colorado | DR-0054698 |
| Kansas | 04-37944 |
| New Mexico | MD2015-0757 |
| Montana | 55170 |
| Ohio | 35.132516 |
| Wyoming | 12303A |
| New Jersey | 25MA10747600 |

**DEA numbers**

BI-4277744
XI-4277744   (Buprenorphine Provider)
FI8544264
FI8599411

**Education**

| | |
|---|---|
| Medical 1987 – 1992 | Stanford University School of Medicine |
| | Stanford, California |
| | MD 1992 |
| Graduate 1985 – 1987 | Howard University |
| | Department of Anatomy |
| | Washington, DC |
| | No degree awarded |
| Undergraduate 1979 – 1985 | Michigan State University |
| | East Lansing, Michigan |
| | BS – Physiology, 1983 |

**Internship and Residency**

| | |
|---|---|
| 1992 –1995 | Los Angeles County-USC Medical Center |
| | Department of Surgery |
| | Los Angeles, California |

Page 2 – CV - Ivens

| | |
|---|---|
| **Professional Organizations** | *President – American Coll. of Correctional Physicians (2017-2019)*<br>*Board of Trustees – NCCHC (Appointment starts in 2020)*<br>*Delegate Assembly - American Correctional Association*<br>*American Correctional Association – Health Care Committee*<br>*Board of Directors – Correctional Medical Institute*<br>*Academy of Correctional Healthcare Professionals*<br>*American Telemedicine Association* |
| **Fellowship** | Fellow – American College of Correctional Physicians |

**Professional Experience**

September 2014 – Present                                                                 Nashville, TN
**Chief Medical Officer**
Corrections Corporation of America (Now CoreCivic)
Oversee the medical services at 60+ correctional facilities (>50,000 patient inmates) in 17 states plus the District of Columbia
Chair, Morbidity and Mortality Committee
Chair, Professional Practice Executive Committee
Chair, Pharmacy and Therapeutics Committee
Chair, Peer Review Committee
Chair, Telehealth Steering Committee
Member, Medical Risk Management Committee
Participate in budgeting, cost control, partner relations, contract negotiation, policy development, and corporate medical responses

September 2014 – Present                                                                 Nashville, TN
**President/Owner**
Correctional Medicine Associates, PC
Oversee PC member hiring, benefits, retention, and discipline of >150 physicians, nurse practitioners, physician assistants, and mental health professionals.
Supervise Deputy CMO and Regional Medical Directors in utilization management and quality of care issues
Perform staff development in the way of articles, conferences, conference calls, and onsite meetings to improve quality health care

Dec 2007 – September 2014                                                                Florence, AZ
**Regional Medical Director**
Corrections Corporation of America
Direct patient care in Arizona, Oklahoma, California and Mississippi
Oversee the medical services at several CCA Facilities in
California, Arizona, Tennessee, Mississippi, Oklahoma, Colorado,
New Mexico, and Montana including Utilization review, Non – formulary
Medication authorization and Case Care Review.

Jan 2009 – November 2011                                                              California City, CA
**President and Chief Financial Officer**
Correctional Medicine Associates of California

Page 3 – CV - Ivens

| | | |
|---|---|---|
| **Professional Experience** (Continued) | Sep 2011 – Present **Telehealth Medical Staff** Provide telehealth services in AZ, OK, KS, NM, TN and MS Corrections Corporation of America | Florence, AZ |
| | February 2005 – Dec 2007 **Regional Medical Director** Correctional Medical Services, Inc. Michigan Regional Office – CMS | East Lansing, MI |
| | June 2003 – Feb 2005 **Regional Medical Director and Consultant Surgeon** Correctional Medical Services, Inc. MS Regional Office | Jackson, MS |
| | July 2002 – May 2003 **Regional Medical Director and Consultant Surgeon** Lois DeBerry Special Needs Facility and Tennessee Regional Office Correctional Medical Services, Inc. | Nashville, TN |
| | July 2000 – June 2002 **Regional Medical Director and Consultant Surgeon** Correctional Medical Services, Inc. DE Regional Office | New Castle, DE |
| | August 1998 – June 2000 **Regional Medical Director and Consultant Surgeon** Prison Health Services, Inc. DE Regional Office – PHS | Newark, DE |
| | May 1998 – Aug 1998 **Interim Regional Medical Director** Prison Health Services, Inc. Indiana Regional Office – PHS | Indianapolis, IN |
| | May 1997-May 1998 **Assistant Regional Medical Director** Prison Health Services, Inc. Alameda County Jails | Alameda, CA |
| | August 1995 – May 1997 **Medical Director** Plainfield Correctional Facility Indiana Department of Correction | Plainfield, IN |

|  |  |
|---|---|
| August 1995 – May 1997 | Plainfield, IN |

**Medical Director**
Reception and Diagnostic Center
Indiana Department of Correction

|  |  |
|---|---|
| August 1995 – May 1997 | Putnamville, IN |

**Medical Director**
Putnamville Correctional Facility
Indiana Department of Correction

**Publications**

**Ivens, K.,** *CorrDocs*, President's Column, Volume 22, Issue 4, Fall 2019

**Ivens, K.,** *CorrDocs*, President's Column, Volume 22, Issue 3, Summer 2019

**Ivens, K.,** *CorrDocs*, President's Column, Volume 22, Issue 1 Spring 2019

**Ivens, K.,** *CorrDocs*, President's Column, Volume 21, Issue 4, Winter 2018

**Ivens, K.,** *CorrDocs*, President's Column, Volume 21, Issue 3, Fall 2018

**Ivens, K.,** *CorrDocs*, President's Column, Volume 21, Issue 2, Summer 2018

**Ivens, K.,** *CorrDocs*, President's Column, Volume 21, Issue 1, Spring 2018

**Ivens, K.,** *CorrDocs*, President's Column, Volume 20, Issue 4, Winter 2017

**Ivens K**., Gazzano, H., O'Hanley, P., and Waldman, S.A. Heterogenicity of Intestinal Receptors for Escherichia coli Heat-Stable Enterotoxin. *Infection and Immunity*, 58 (6), 1990: pp1817-20.

Flavin, T., Shizuru, J., Seydel, K., Wu, A., Fujimoto, N., Hoyt, E.G., **Ivens**, **K**., Billingham, M., Fathman, C.G., and Starnes, V. A. Selective T-cell Depletion with Ox-38 Anti CD-4 Monoclonal Antibody Prevent Cardiac Allograft Rejection in Rats. *Journal of Heart Transplantation*. 9 (5), 1990: pp482-488.

Flavin, T., **Ivens, K**., Rothelin, R., Faanes, R., Cayberger, C., Billingham, M., and Starnes, V.A. Monoclonal Antibodies Against Intercellular Adhesion Molecule 1 Prolong Cardiac Allograft Survival in Cynomolgus Monkeys. *Transplant Proceedings*. 23 (1), February, 1991: pp533-534.

Falvin, T., **Ivens**, **K**., Wang, J., Gutierrez, J., Hoyt, E.G., Billingham, M., and Morris, R.E. Initial Experience with FK506 as an immunosuppresant for Nonhuman Primate Recipients of Cardiac Allografts. *Transplant Proceedings*. 23 (1) February, 1991: pp531-532.

Starnes, V.A., Griffin, M., Pitlick, P., Bernstein, D., Baum, D., **Ivens**, **K**., and Shumway, N.E. Current Approach to Hypoplastic Left Heart Syndrome: Palliation, Transplant or Both? *Journal of Cardiovascular and Thoracic Surgery*, November, 1992.

Chen, R., **Ivens**, **K**., Griffith, G., Shizuru, J. Starnes, V.A., and Weissman, I. Granzyme, A. Expression as a Test of Early Detection of Rat Heart Allograft rejection. Published in 1993.

**Ivens**, **K**., Lymphangioleiomyomatosis. Chapter in Fifty Mores Diseases, Fifty More Diagnoses. Edited by M. Perlroth and D. Weiland. Chapter submitted for publication. 1992.

**Ivens**, **K**., Herfkins. R., Bergen, C., Billingham, M., Berry, G., Starnes, V.A., and Shumway, N.E. Twelve Year Follow-up Studies After Combined Heart-Lung Transplantation in a Rhesus Monkey.

**Teaching Experience**

JOHNS HOPKINS UNIVERSITY

August 2001 - 2006

**Faculty**-Correctional Medical Institute, Baltimore, MD

Suturing and Surgical issues in a correctional setting – Lecture and workshop. Presented in 2001 through 2006.

Chronic wound Management – Presented in September 2007

2005 - 2010

**Organizing Committee**-Correctional Medical Institute, Baltimore MD

On the committee that arranges the annual CMI conference. We select date of the conference, location, topics, faculty, advertisement, corporate and foundation sponsorship.

2007 – 2010  **President** -Correctional Medical Institute, Baltimore MD

Elected to lead CMI after the September 2007 conference.

STANFORD UNIVERSITY

**Lecturer**-Pathophysiology

Fall – 1988, Fall – 1989, Fall – 1990, Fall – 1991, Fall – 1992, Fall – 1993

**Presentations**

August 2018 – American Correctional Association Summer Conference, Minneapolis, MN, Moderator – Cancer Care Behind Bars

May 2014 – National Corrections Institute Meeting in Denver, CO – Remote Presentation on Telehealth in Corrections with Marc Stern, MD

May 2014 – National Corrections Institute Meeting in Denver, CO – Remote Presentation on Telehealth in Corrections with Marc Stern, MD

NCCHC and ACHSA National Conferences

   I have made presentations in the following correctional topics:
   -Sleep Hygiene
   -The use of bedside Troponin testing in the Assessment of Chest Pain
   -Traumatic Wound Care

Society of Correctional Physicians Annual Meetings

Several presentations on surgical issues, including laceration care and I&D of Abscesses. Most recently, October 2012 in Las Vegas, but others at conferences in Anaheim, CA; Nashville, TN; Saint Louis, MO; and Baltimore, MD.