# EXHIBIT 1

United States v. Phuong Tang, Case No. 2:20-cr-0054-GMN-DJA, ECF No. 34

RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
KATHERINE TANAKA
Assistant Federal Public Defender
Nevada State Bar No. 14655C
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577/Phone
(702) 388-6261/Fax
Katherine_Tanaka@fd.org

Attorney for Phuong Tang

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:20-cr-0054-GMN-DJA |
| Plaintiff, | **Emergency Motion to Reopen Detention Hearing Due to COVID-19 Pandemic** |
| v. | |
| PHUONG TANG, | |
| Defendant. | |

Phuong Tang moves this Court for an order granting his immediate release due to the COVID-19 pandemic. Mr. Tang, who is a pretrial defendant detained at the Southern Nevada Detention Center, is among the group of people the Centers for Disease Control and Prevention ("CDC") categorizes as being most-at-risk for contracting COVID-19—a dangerous virus rapidly spreading across the world and, having hit the United States, is spreading across Nevada.

## I. INTRODUCTION

The Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."[1]

The health risk to Mr. Tang is a compelling reason to grant release. Mr. Tang has a heightened risk of contracting the COVID-19 virus because of the number of physical health conditions from which he suffers that put a strain on his body. Mr. Tang has a list of at least 12 medications he must take while in Pahrump that support him in both his physical and mental health. In addition to Mr. Tang's health issues, Mr. Tang has a heightened risk of contracting the COVID-19 virus given the conditions at the Southern Nevada Detention Center. If released, Mr. Tang would move back into the home he owns in Las Vegas and would abide by the number of conditions this Court could impose to reasonably assure the safety of the community. As described below, an order granting pretrial release is necessary.

## II. FACTUAL BACKGROUND

### A. Changed Circumstances: COVID-19 Outbreak

On March 11, 2020, the World Health Organization officially classified COVID-19 a pandemic.[2] Governor Steve Sisolak declared a State of Emergency in Nevada on March 12, 2020. On March 15, 2020, the CDC recommended that all in-person events consisting of 50 or more people be postponed or cancelled throughout the United States.

As of March 15, 2020, Nevada has 25 confirmed COVID-19 cases.[3] Also as of March 15, 2020, the new strain of coronavirus which causes COVID-19, has infected over 167,00

---

[1] 18 U.S.C. § 3142(i).

[2] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020) at https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[3] https://www.reviewjournal.com/news/politics-and-government/nevada/5-new-cases-of-covid-19-reported-in-washoe-nevada-total-at-26-1981886/ (March 15, 2020); *see also*

2

people, leading to at least 6,304 deaths worldwide.[4] These numbers, sadly, have been increasing daily.

The CDC's guidelines provide that individuals at higher risk of contracting severe forms of COVID-19—adults over 60 years old and people with chronic medical conditions—take immediate preventive actions, including avoiding crowded areas and staying home as much as possible.[5] Even for those without such conditions, the CDC's guidelines provide that individuals maintain distance between themselves and others.[6]

Nevada responded to the COVID-19 emergency by taking extraordinary measures to protect its populace and slow the spread of the virus. This initially included indefinitely cancelling all events with an expected attendance of 250 or more people such as (1) the Pac-12 men's basketball tournament; (2) all Mountain West spring sports for UNLV athletics; (3) CinemaCon 2020; and (4) Dell Technologies World 2020.

Nevada has now intensified its protective measures. Starting the week of March 16, 2020, all civil and criminal jury trials in Clark County District Court are suspended for at least a month and all scheduled, nonessential court hearings are requested to be conducted by video or telephonic means or rescheduled;[7] all of Nevada's K-12 schools will be closed and will not reopen until the State Chief Medical Officer evaluates the public health risk and determines it

---

https://www.southernnevadahealthdistrict.org/newsrelease/ southern-nevada-health-district-announces-nine-new-positive-cases-of-covid-19/ (last visited March 15, 2020).

[4] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (March 15, 2020), https://www.nytimes.com/interactive/2020/world/ coronavirus-maps.html (updating regularly).

[5] *People at Risk for Serious Illness from COVID-19*, CDC (March 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html.

[6] *How to Protect Yourself*, CDC (March 15, 2020), https://www.cdc.gov/ coronavirus/2019-ncov/prepare/prevention.html.

[7] https://www.reviewjournal.com/crime/courts/clark-county-district-court-to-suspend-jury-trials-due-to-coronavirus-fears-1980345/.

3

is safe to do so;[8] and casinos have announced complete closure of their properties. Staring the week of March 23, 2020, UNLV and Toro University are moving to online classes.

This Court's March 13, 2020 General Order 2020-02, also now allows those previously required to appear in person at the Courthouse to appear by telephone or video conference if they fall within any of the groups the Court has identified as no longer permitted to enter the Courthouse due to COVID-19 exposure or potential exposure. Further, this Court's March 16, 2020 General Order 2020-03 has continued all civil and criminal trials, including any associated deadlines to April 10, 2020.

Nonetheless, Nevada has reported 19 COVID-19 cases on March 13, 2020, and 25 cases just two days later on March 15, indicating ongoing community spread throughout Nevada.[9] We must therefore take every necessary action to protect vulnerable populations and the community at large. The men and women incarcerated at Southern Nevada Detention Center are a part of our community and all reasonable measures must be taken to protect their health and safety.

**B. Conditions of Confinement and Spread of Coronavirus**

Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.[10] Inmates cycle in and out of detention facilities from all over the world and country, and those who work in detention facilities—including correctional officers and

---

[8] https://www.reviewjournal.com/local/local-nevada/sisolak-orders-closure-of-nevada-schools-to-slow-coronavirus-spread-1981764/ (March 15, 2020).

[9] *Compare* https://www.washoecounty.us/outreach/2020/03/2020-03-15-covid19-updated-cases.php, *with* https://www.southernnevadahealthdistrict.org /news-release/southern-nevada-health-district-announces-nine-new-positive-cases-of-covid-19/; https://www.washoecounty.us/outreach/2020/03/2020-03-13-covid19-third-case.php (last visited March 16, 2020).

[10] Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047, 1047-1055 (2007), https://doi.org/10.1086/521910.

4

care and service providers—leave and return to those facilities daily without COVID-19 screening. Additionally, incarcerated individuals often suffer poorer health than the general population. Even when not faced with a potentially deadly pandemic, incarcerated individuals received limited medical care.[11]

According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe" because "infection control is challenging in these settings."[12] In order to reduce the impact of COVID-19 on jails and prisons, experts advise against incarcerating people who are not a public safety risk. Tyler Winkelman, co-director of the Health, Homelessness, and Criminal Justice Lab at the Hennepin Healthcare Research Institute in Minneapolis, advises "we are increasing [the detainees] health risk by keeping them [incarcerated] . . . . [t]his is the time to make sure we have as few people at risk as possible."[13]

Internationally, COVID-19 is a grave concern for those detained in prisons. In China, officials have confirmed the coronavirus spreading at a rapid pace in Chinese prisons, counting 500 cases in February 2020.[14] Secretary of State Mike Pompeo has called for the

---

[11] U.S. Dep't of Justice, Bureau of Justice Statistics Laura M. Maruschak, Marcus Berzofsky, and Jennifer Unangs, *Medical Problems of State and Federal Prisoners and Jail Inmates*, 2011-2012 at 1-22 (Feb. 2015), https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[12] "Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf.

[13] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020), https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-health-outbreak-covid-19-flu-soap.

[14] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus as More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider

5

release of Americans detained in Iranian prisons because of the "deeply troubling" "[r]eports that COVID-19 has spread" to its prison system, noting "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[15] Courts across Iran have granted 54,000 inmates furloughs as part of the protective measures to contain COVID-19 across the country.[16]

In the United States, numerous jurisdictions have already taken steps to facilitate the release of both incarcerated pretrial detainees and convicted inmates to reduce the prison population during this national crisis. As part of this movement, jurisdictions are releasing older inmates and sick inmates, and discouraging or refusing incarceration of individuals arrested on non-violent misdemeanor charges and expediting the plea and bail process.[17]

---

(Feb. 21, 2020), https://www.businessinsider.com/500-coronavirus-cases-reported-in-jails-in-china-2020-2.

[15] Jennifer Hansler and Kylie Atwood, *Pompeo Calls for Humanitarian Release of Wrongfully Detained Americans in Iran Amid Coronavirus Outbreak*, CNN (Mar. 10, 2020), https://www.cnn.com/2020/03/10/politics/mike-pompeo-iran-release-detained-americans-coronavirus/index.html.

[16] Claudia Lauer and Colleen Long, *US Prisons, Jails on Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020), https://apnews.com/af98b0a38aaabedbcb059092db356697.

[17] In New York, Brooklyn District Attorney Eric Gonzalez, joined by public health experts, has asked Governor Cuomo to grant emergency clemencies to elderly and sick prisoners (Sarah Lustbader, *Coronavirus: Sentenced to COVID-19*, The Daily Appeal (Mar. 12, 2020), https://theappeal.org/sentenced-to-covid-19/); Cuyahoga County (Ohio) is holding mass pleas and bail hearings to reduce the current jail population (https://www.cleveland.com/court-justice/2020/03/ cuyahoga-county-officials-will-hold-mass-plea-hearings-to-reduce-jail-population-over-coronavirus-concerns.html); Mahoning County (Ohio) jail is refusing all non-violent misdemeanor arrestees (https://www.wkbn.com/news/coronavirus/ mahoning-county-jail-refusing-some-inmates-due-to-coronavirus-outbreak*/); see also* Collin County (TX) (https://www.dallasnews.com/news/public-health /2020/03/12/facing-coronavirus-concerns-collin-county-sheriff-asks-police-not-to-bring-petty-criminals-to-jail/).

6

**C.     Specific Conditions at the Southern Nevada Detention Center**

The Office of the Federal Public Defender routinely represents those incarcerated at the Southern Nevada Detention Center and regularly visits the facility and communicates with those incarcerated there, the corrections officers who work there, and the U.S. Marshals who transport individuals to and from the facility. As such, the following is my understanding of Southern Nevada Detention Center's facility, accommodations, and policies.

1.     Detainees at Southern Nevada Detention Center that are housed in general population are placed in large dormitory style rooms in beds crammed one right next to the other, preventing detainees from engaging in social distancing and self-quarantine precautions as the CDC recommends.

2.     Detainees at Southern Nevada Detention Center share a limited number of toilets, sinks and showers with the other detainees in their housing unit, creating a greater risk to exposure to COVID-19.

3.     Detainees at Southern Nevada Detention Center are significantly restricted in their movements as they are always detained in close quarters.

4.     The Southern Nevada Detention Center has limited access to personal hygiene items such as tissues, soap, disinfectant, or hot water, which prevent detainees from taking recommended precautions to minimize the spread of COVID-19. Those detainees who cannot afford to buy their own soap, hygiene products, or laundry detergent, suffer an even greater limitation on their ability to maintain proper hygiene.

5.     There are significant limitations on Southern Nevada Detention Center's medical services. The facility does not have a full-time doctor on staff; does not have an on-site hospital unit on-site; its medical staffing is limited; and the town of Pahrump where the facility is located does not have a hospital equipped to handle a significant COVID-19 outbreak if one occurs at the facility.

6. Southern Nevada Detention Center also lacks the resources necessary to engage in screening and testing of detainees, correctional staff, law enforcement officers, and other care and service providers who enter the facility. These limitations mean Southern Nevada Detention Center is not screening anyone being brought into the facility by first segregating them, testing them for the COVID-19, questioning them about community exposure and travel, and then monitoring their temperature for 14-days before admitting them into the general population.

Instead, as new arrestees arrive, if they are not symptomatic, they are brought into the Southern Nevada Detention Center and detained among the existing detained population, potentially bringing COVID-19 into this large population detained in extremely close quarters and inadequate sanitary conditions.

### D. Impacts on Mr. Tang's ability to prepare his defense

Mr. Tang's continued detention during this pandemic will also significantly affect his ability to prepare his defense. It is unwise for undersigned counsel to visit Mr. Tang at Southern Nevada Detention Center during this uncertain time because of concerns about potentially exposing Mr. Tang to COVID-19 unknowingly. This impacts undersigned counsel's ability to effectively represent Mr. Tang because undersigned counsel and Mr. Tang cannot discuss defenses, investigation, and negotiations. There are significant limitations on alternative access to Mr. Tang if a quarantine is ordered because there are only 3 or 4 video conference units at Southern Nevada Detention Center and the phones are recorded, which prohibits counsel from speaking candidly to Mr. Tang about his case.

## III. ARGUMENT

### A. The Bail Reform Act Requires Mr. Tang's Release.

A "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent

that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."[18]

Liberty is the norm and "detention prior to trial or without trial is the carefully limited exception."[19] One charged with a crime is presumed innocent.[20] A single individual unnecessarily detained before trial is one individual too many, and the increasing use of the practice places tremendous wear on our constitutional system.[21] Due to the crucial interests involved, a "case-by-case" approach is required at any stage of the case in assessing the propriety of pretrial detention.[22] The courts have long recognized there is no greater necessity than keeping a defendant alive, no matter the charge. Our society does "not punish those who have not been proven guilty. When we do punish, we do not act cruelly."[23]
The circumstances that existed when Mr. Tang was ordered detained have now changed. There is a pandemic that poses a direct risk far greater if Mr. Tang continues to be detained. Mr. Tang is vulnerable because his physical and mental health conditions require medical attention that Mr. Tang was not fully receiving at the Southern Nevada Detention Center even before the COVID-19 outbreaks. Further, Mr. Tang is at a greater risk of exposure while incarcerated at the Southern Nevada Detention Center due to the facility's inability to

---

[18] 18 U.S.C. § 3142(i).

[19] *United States v. Salerno*, 481 U.S. 739, 755 (1987).

[20] *Stack v. Boyle*, 342 U.S. 1, 4 (1951).

[21] *United States v. Montalvo-Murillo*, 495 U.S. 711, 723–24 (1990) (Stevens, J., dissenting, joined by Brennan and Marshall, JJ).

[22] *See United States v. Gonzales Claudio*, 806 F.2d 334, 340 (2d Cir. 1986) (discussing due process analysis for evaluating propriety of prolonged pretrial detention, and the interests at stake) (citations omitted).

[23] *United States v. Scarpa*, 815 F. Supp. 88 (E.D.N.Y. 1993) (pretrial defendant with AIDS facing murder charges released on bail because of the "unacceptably high risk of infection and death on a daily basis inside the MCC").

9

implement all necessary precautions against the virus. Ultimately, this Court should consider the "total harm and benefits to prisoner and society" that continued pretrial imprisonment of Mr. Tang will yield, relative to the heightened health risks posed to Mr. Tang during this rapidly encroaching pandemic.[24]

### B. Conditions of Release are Available that Allow Mr. Tang to be Treated Humanely While Also Ameliorating any Danger to the Community.

For Mr. Tang, his life—not only his liberty—is at risk. This creates a powerful incentive to abide by any release conditions the Court may impose and changes the calculus that initially led to the denial of bail in this case. At Mr. Tang's detention hearing, this Court was primarily concerned with contact Mr. Tang might have with prospective witnesses in his case. But this Court can fashion conditions that will reasonably assure the safety of these prospective witnesses and the community at large—all of which will also align with the precautions Mr. Tang would need to take to minimize his risk of exposure to COVID-19.

As discussed extensively in Mr. Tang's motion for review of the detention order, conditions including GPS monitoring, home detention, and a stay-away order from the podiatry clinic in the VA Southern Nevada Healthcare System, and any employee of the podiatry clinic, can be imposed to reasonably assure the safety of the community. *See* Motion for Review of Magistrate Judge's Detention Order, *United States v. Phuong Tang*, 2:20-cv-0156-KJD-EJY (D. Nev. Jan. 22, 2020), ECF No. 1.[25] Mr. Tang is no longer employed at the podiatry clinic, so a stay-away order and home-detention can easily be implemented. Further,

---

[24] *See Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (reducing sentence where defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case").

[25] Mr. Tang's motion for review of the detention order was denied on February 12, 2020. *Id.* at ECF No. 7. Mr. Tang is currently litigating an appeal of the district court's denial order in the Ninth Circuit. *See United States v. Phuong Tang*, 20-10082 (9th Cir. Mar. 11, 2020).

10

undersigned counsel spoke with Mr. Tang's family and confirmed that Mr. Tang's father, Long Tang, is still willing to act as a third-party custodian for Mr. Tang. At Mr. Tang's detention hearing, Pretrial Services found Mr. Tang's father to be a suitable custodian, provided he moved in with Mr. Tang. Mr. Tang's father has indicated he will travel back to Las Vegas to stay with his son.

Further, it should be noted that over the past two months, Mr. Tang has struggled to get the full healthcare treatment he needs to maintain his mental and physical health while detained in Pahrump. Mr. Tang's ability to move has declined since being incarcerated. He spends most of his days moving via wheelchair, and he will likely have the same mobility restrictions upon his release. Mr. Tang's vision has also substantially declined since being incarcerated. He wears both tinted glasses and an eye-patch to mitigate the strain from the light and to help focus his limited vision. In light of all the circumstances, Mr. Tang poses a lower risk of violating supervision, especially during a global pandemic where even leaving the house could endanger his life.

### IV. CONCLUSION

Mr. Tang is vulnerable to COVID-19 due to his detention at Southern Nevada Detention Center and the conditions of his confinement there. For all the above reasons, Mr. Tang should be granted release with the following conditions imposed: (1) GPS ankle monitoring; (2) an order to stay away from the podiatry clinic at the VA Southern Nevada Healthcare System and all of its employees; (3) home-detention; and (4) supervision by Mr. Tang's father acting as a third-party custodian.

///

///

///

Dated March 16, 2020.

                                        Respectfully submitted,

                                        RENE L. VALLADARES
                                        Federal Public Defender

                           By:  */s/ Katherine Tanaka*
                                        KATHERINE TANAKA
                                        Assistant Federal Public Defender
                                        Attorney for Phuong Tang

**Certificate of Electronic Service**

The undersigned certifies that she is an employee of the Federal Public Defender for the District of Nevada and is a person of such age and discretion as to be competent to serve papers.

That on March 16, 2020, she served an electronic copy of the above and foregoing **Emergency Motion to Reopen Detention Hearing Due to COVID-19 Pandemic** by electronic service (ECF) to the person named below:

> NICHOLAS A. TRUTANICH
> United States Attorney
> RACHEL KENT
> Special Assistant United States Attorney
> 501 Las Vegas Blvd. South
> Suite 1100
> Las Vegas, NV 89101

*/s/ Rosana Aporta*
Federal Public Defender Employee

13