1   Rene L. Valladares
    Federal Public Defender
2   Nevada State Bar No. 11479
    Erin Gettel
3   Assistant Federal Public Defender
    411 E. Bonneville, Ste. 250
4   Las Vegas, Nevada 89101
    (702) 388-6577
5   Erin_Gettel@fd.org

6

7                    **UNITED STATES DISTRICT COURT**

8                         **DISTRICT OF NEVADA**

9

10  Jess Elijio Carranza, Jimmy Carter Kim,     Case No. 2:20-cv-01586-GMN-DJA

11              Plaintiffs/Petitioners,          **Reply to response (ECF No. 13)
                                                 to Petition (ECF No. 1)[1]**
12          v.

13  Brian Koehn, Warden, Nevada Southern
    Detention Center,
14
                Defendant/Respondent.
15

16          Respondent urges this Court to deny the petition because it claims that its

17  protocols comply with the guidelines and recommendations of the Centers for

18  Disease Control and Prevention, so it has taken objectively reasonable steps to

19  protect the safety and well-being of all detainees, including petitioners.  As

20  explained below, although it is true that Respondent has implemented some

21  COVID-19 precautions, several of its policies either do not follow or directly

22  contradict CDC guidance.  This Court should find that Respondent has acted

23  with deliberate indifference to Petitioners' health and safety.  At the very least,

24  this Court should grant the requested interim fact finding and/or hold an

25  evidentiary hearing.

26  _____

              [1] Certification: This filing is timely.  ECF No. 16.

## Background

Respondent claims that "Petitioners' allegations do not reflect at all the reality of what is happening at NSDC in response to COVID-19."[2]  Respondent claims that it has implemented "mandatory screening and quarantine protocols; extensive sanitization requirements; an abundant supply of personal protective equipment; restricted-movement and social distancing requirements; and limitations to visitations," which "comply with the guidelines and recommendations of the Centers and Disease Control and Prevention."[3]

Nonetheless and despite the lack of testing, there has been a steady stream of confirmed COVID-19 cases at NSDC.  At the time Respondent filed its response to the petition on September 17, 2020, there was only one confirmed positive case[4] and no unit was on cohort/quarantine status.[5]  That has changed.

On September 23, 2020, the USMS notified the FPD office that there were currently four confirmed positive detainees and two staff members.  On September 28, 2020, the USMS advised the FPD office that three additional detainees had tested positive, bringing the total count to seven detainees and two staff members.  The current number of confirmed positive detainee and staff cases is unknown, as is how many and what units are currently on quarantine/cohort status.

---

[2] ECF No. 13 at 2.

[3] *Id.*

[4] ECF No. 13 at 3.

[5] *Id.* at 28.

2

1

2

**Reply**

**A.    CDC Guidelines**

On July 22, 2020, the CDC issued interim guidance on management of COVID-19 in correctional and detention facilities.[6]  That guidance, like those that came before and after, includes recommendations for quarantining close contacts of individuals with COVID-19 and medically isolating those with confirmed or suspected cases.[7]  It advises that detainees who are close contacts of someone with confirmed or suspected COVID-19 should be placed under quarantine for 14 days,[8] while those who have confirmed or suspected COVID-19 should be placed in medical isolation at least until CDC criteria for discontinuing home-based isolation has been met.[9]  It further advises that only confirmed-positive individuals should be placed under medical isolation as a cohort and that confirmed positive individuals should not be placed with suspected positive individuals or those quarantined due to close contacts.[10]

Recognizing that isolated and quarantined detainees are often placed in disciplinary housing due to space restrictions, the guidance explicitly instructs detention facilities to "[e]nsure that medical isolation for COVID-19 is distinct from punitive solitary confinement of incarcerated/detained individuals, both in

---

[6] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.  This is the most thorough guidance currently available on the CDC website.  The CDC also issued interim guidance for management of COVID-19 in jails and detention facilities on March 23, 2020, but that link is no longer available.

[7] *Id*. at 15–16, 18–20 (The July 22, 2020, guidance is 25 pages when printed so cites are to those page numbers).

[8] *Id*. at 18.

[9] *Id*. at 16.

[10] *Id*. at 15–16.

3

name and in practice."[11]  This is because detainees may be hesitant to report COVID-19 symptoms—leading to delayed diagnosis, continued transmission, and other adverse health outcomes—in order to avoid these conditions.[12]  Recognizing that COVID-19 will also restrict in-person visitation, the guidance also recommends reducing or temporarily eliminating the cost of phone calls for all incarcerated people and increasing their telephone privileges to promote mental health.[13]

On August 10, 2020, the CDC issued interim considerations for COVID-19 testing in correctional and detention facilities.[14]  The update identifies three scenarios in which testing may be needed: (1) individuals with signs or symptoms consistent with COVID-19; (2) asymptomatic individuals with recent known or suspected exposure to COVID-19 to control transmission; and (3) asymptomatic individuals without known or suspected exposure to COVID-19 for early identification.[15]  As to the first scenario, the update cautions that "symptom screenings cannot identify individuals with COVID-19 who may be asymptomatic or presymptomatic and therefore will not prevent all individuals with COVID-19 from entering the facility."[16]

---

[11] *Id.* at 15.

[12] *Id.*

[13] *Id.* at 12.

[14] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html (accessed October 1, 2020).

[15] *Id.* at 2 (The August 10, 2020, interim considerations are seven pages when printed; cites are to page numbers at the bottom of the document when printed).

[16] *Id.*

4

As to the second, which is undertaken to control transmission, the update recommends testing for all close contacts of persons with COVID-19 infection.[17] It further encourages "a broader testing strategy, beyond testing only close contacts within the facility, to reduce the chances of a large outbreak."[18] "[T]argeted (e.g., a specific housing unit) or facility wide testing should be considered if a single [detainee] or staff member in the facility tests positive" for the virus.[19]  Additionally, all close contacts should be placed under quarantine restrictions for 14 days after their last exposure to the infected individual.[20]

The third scenario is aimed at early detection and beneath it are several options that facilities in communities with moderate to substantial levels of community transmission should consider, including: baseline testing for all current detainees; testing newly arriving detainees before they join the rest of the population in the facility; and implementing a "routine intake quarantine" in which new detainees are housed separately for 14 days before being integrated into general housing.[21]

The update also includes transmission-based precautions for suspected and confirmed COVID-19 cases.  For people with mild to moderate COVID-19 illness, medical isolation can be discontinued when at least ten days have passed since symptoms first appeared or (since positive test if asymptomatic), at least 24

---

[17] *Id.* at 3.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.* at 4.

5

hours have passed since last fever without use of fever-reducing medications, and symptoms have improved.[22]

In sum, the CDC recommends isolation (confirmed or suspected positive) and quarantine (new arrivals or close contacts with confirmed or suspected positive individuals) periods of at least ten or fourteen days, respectively.[23]  The CDC has noted this apparent conflict and explained that it recommends the longer, 14-day clock based on the time it takes to develop illness if infected. Thus, it is possible that a person *known* to be infected could leave isolation earlier than a person who is quarantined because of the *possibility* they are infected.[24]

## B.    NSDC policies and practices

Despite the prevalence of COVID-19 in Las Vegas and surrounding areas, NSDC has never conducted baseline testing and does not test incoming detainees regardless of where they came from (i.e., the street, either locally or a high-transmission area; a state or local law-enforcement agency; or detention facilities in other states).[25]  Instead, NSDC questions incoming detainees about possible exposure and symptoms and conducts temperature checks.[26]  Only if a detainee exhibits or reports symptoms or possible exposure is the person even "assessed

---

[22] *Id.* at 5.

[23] *Compare id.* at 4*, with* id. at 5.

[24] https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-in-home-patients.html (last accessed October 1, 2020).

[25] ECF No. 13 at 24–25 (discussing intake procedures).  ECF No. 1 at ¶ 30. The USMS advised the FPD office that all new arrivals would be tested beginning August 20, 2020.  That either never happened, or did for only a very short period of time.

[26] ECF No. 13 at 24.

for COVID-19 testing."[27]  It's unclear what needs to happen for an incoming
detainee to actually be tested[28] or what symptoms besides a fever of greater than
100.4 must be present for any detainee, whether newly arriving or not, to be
tested.[29]  Respondent does not even claim that it tests all close contacts of
confirmed or suspected positive individuals or that it quarantines them for 14
days, both of which the CDC recommends.[30]

Rather than testing all new detainees, Respondent has elected to
implement a routine intake quarantine of ten days (same as for confirmed
positive individuals).  According to Respondent, all incoming detainees who pass
intake screening are placed "in either the AA or CA Pod and (absent exceptional
circumstances) quarantined for ten days."[31]  Each arrival group is separated from
other groups who are also subject to the ten-day quarantine period so that arrival
groups "do not mix."[32]  Notably, these are the very same pods in which confirmed
or suspected positive detainees as well as detainees in disciplinary housing are
placed.  This is problematic for three main reasons.

First, even assuming NSDC not only accurately tracks and separates those
in different arrival groups but also other detainees who have been tested or
confirmed positive and separates all of them by the dates they arrived in
isolation, they walk the same halls, use the same showers, and share a common
ventilation system, so they are not truly separated.  Second, it appears that

---

[27] *Id.* at 25.

[28] *Id.* at 24–25.

[29] *Id.* at 3–4.

[30] August 3, 2020, interim considerations at 3.

[31] ECF No. 13 at 25.

[32] *Id.*

NSDC isolates/quarantines together confirmed or suspected positive detainees, new arrivals, and those in disciplinary housing—something the CDC warns against.[33]

Third, ten days is not the proper quarantine period for routine intake quarantine, for which the CDC recommends a 14-day quarantine period.[34]  This also assumes that Respondent is enforcing the ten-day period.  However, Petitioners have both personally witnessed newly arrived detainees enter their unit after only three days of quarantine.[35]  And former detainee Nagel personally experienced this when he was quarantined for only eight days upon arriving at NSDC from a pretrial detention facility in Anchorage, Alaska.[36]

In addition to its ten-day quarantine and isolation periods, Respondent offers that "[w]hen detainees are tested for COVID-19, they are moved to medical isolation to limit the spread of the disease while their results are pending."[37]  But that is not what happened when Jimmy Kim was tested,[38] and there is nothing to suggest that this was an isolated incident.  Notably, Respondent does not specifically refute that Kim was left in the G4 Unit with Carranza and others while his test was pending from July 6 to July 8, 2020.[39]

Respondent also does not really contest that it treats medically isolated and quarantined individuals the same as those in disciplinary housing, though it

---

[33] July 22, 2020, interim guidance at 15–16.

[34] August 10, 2020, interim considerations at 4.

[35] Exhibit A (Kim declaration) at ¶ 7; Exhibit B (Carranza declaration) at ¶ 5.

[36] Exhibit C ( AFPD Investigator Briggs declaration) at ¶ 4.

[37] *Id.* a

[38] Exhibit A at ¶2.

[39] ECF No. 13 at 9.

8

disputes some of the specifics.  Respondent admits that those housed in Unit CA are treated the same regardless of whether they are there for medical or disciplinary reasons, including being in handcuffs whenever they are outside their cells—even when being taken to the shower.[40]  Despite admitting this, Respondent disputes Petitioner Kim's allegation that he was handcuffed to a wheelchair after collapsing in the medical wing and before being wheeled to Unit CA for isolation.[41]  According to Respondent, this abuse could not have happened or else it would have been documented in his medical file.[42]  Petitioner Kim reported this handcuffing to his AFPD five days after it took place and his account has not only remained consistent,[43] but is also consistent with Respondent's own admission about handcuffing practices in the isolation/quarantine units.

Respondent claims that those in medical quarantine or isolation have access to a law library and telephones and that these units also show movies.[44] Kim's experience and the experience of two recently quarantined newly arriving detainees (Hernandez and Mendoza-Gonzalez)[45] show otherwise and that those housed in these units are treated even worse than those housed there for disciplinary reasons.

---

[40] ECF No. 13 at 25 ("Pursuant to policy, all detainees in restrictive housing units are escorted in handcufs while in the unit"), 39.

[41] *Id.* at 9–10.

[42] *Id.* at 10.

[43] Exhibit A at ¶ 2

[44] ECF No. 13 at 25.

[45] Exhibits D, E.

Not only are they in handcuffs any time they are outside of their cells, but medically isolated and quarantined individuals are rarely outside of them.  When they were quarantined upon arriving at NSDC in early September, Hernandez and Mendoza-Gonzalez noted that half were permitted out on Monday, Wednesday, and Fridays, while the other half were permitted out Tuesday, Thursday, and Sunday—for no more than 30 minutes on each of those dates and only in order to shower.[46]  Thus, the total amount of time these detainees are allowed out of their cells is 1.5 hours per week.[47]  Even if they did have access to the law library, telephone, and leisure room (where movies are available), this would not be enough time to use them.  Unlike medically isolated or quarantined detainees, individuals in segregated housing for disciplinary reasons are allowed outside of their cells Monday through Friday and have access to the leisure room, outdoor yard, and law library.[48]

Petitioner Kim's experience in July was even worse.  He was dumped, sick, into a filthy cell without bedding or soap for eight hours.[49]  He did not receive his property until the fourth day, and, later a book to pass the time.[50]  Kim was not permitted to call his attorney until the fifth day or to take a shower until the seventh.[51]  He was able to use the library only once, and only because the overtime guard who was working thought he was housed there for disciplinary,

---

[46] *See* Exhibits D, E.

[47] *Id.*

[48] Exhibit A at ¶ 6.

[49] Id. at ¶ 3.

[50] *Id.* at ¶ 4.

[51] *Id.* at ¶ 5.

rather than medical, reasons.[52]  The next day, he noticed a strip of tape on his door, which he assumed was meant to signify that he was there for medical reasons.[53]  It was under these conditions of extreme isolation that one newly arrived detainee recently committed suicide during the ten-day isolation period.[54]

The CDC recognizes that punishing those who are suspected or confirmed positive of COVID-19 is dangerous because it discourages reporting symptoms, leading to an array of adverse health consequences.  That is why it explicitly instructs facilities who must use disciplinary housing spaces for medical reasons to "[e]nsure that medical isolation for COVID-19 is distinct from punitive solitary confinement of incarcerated/detained individuals, both in name and in practice."[55]  Respondent has done exactly the opposite: NSDC treats isolated and quarantined individuals even worse than those so housed for disciplinary reasons.

There are a few additional things worth noting.  Respondent is proud to report that it has given Petitioners and other detainees at NSDC one free phone call per week, capped at 20 minutes.[56]  But the CDC recommends reducing or temporarily eliminating the cost of phone calls for all incarcerated people and increasing their telephone privileges to promote mental health.[57]

---

[52] *Id.* at ¶ 6.

[53] *Id.* at ¶ 6.

[54] Exhibits D, E.

[55] July 22, 2020, interim guidance at 15.

[56] ECF No. 13 at 26.

[57] *Id.* at 12.

11

1    Respondent also reports that medically vulnerable individuals are housed

2    in the F1 Unit.[58]  However, as alleged in the petition and as Respondent admits

3    in its reply, Petitioner Carranza is at heightened risk for COVID-19 due to

4    diabetes.[59]  Despite this, Carranza is housed in the G4 Unit and has never been

5    asked if he would prefer to be moved to the high-risk unit.[60]

6    Respondent appears to believe that the nature of Petitioners' current

7    federal charges and pending state charges against them matter.[61]  However,

8    Petitioners have the same constitutional rights as other pretrial detainees

9    regardless of the nature of their charges.  Respondent also attempts to downplay

10   Petitioners' claims by suggesting that they refused medical treatment by refusing

11   cold medication.[62]  Respondent's characterizations are inaccurate and suggest

12   that Petitioners received individualized medical attention on those dates.

13   Instead, Nurse Powers brought a box of cold packs to pill call because so many in

14   the unit were sick.  Petitioners, like others, took multiple packs and so did not go

15   to every single pill call in the days that followed,[63] the timing of which varies and

16   is easily missed if one is asleep.  Even if they had refused cold packs, that does

17   not excuse unconstitutional treatment.  Nor does the fact that Petitioners have,

18   on occasion, used what little commissary money they have to purchase food

19   rather than extra soap.[64]  Finally, Respondent disputes the comments made by

20

21   ─────────────

22   [58] *Id.* at 23.

23   [59] *Id.* at 6.

24   [60] Exhibit B at ¶ 1.

25   [61] ECF No. 13 at 5, 8.

26   [62] ECF No. 13 at 7, 9.

[63] Exhibit A at ¶ 1, Ex B at ¶ 2.

[64] ECF No. 13 at 38–39.

12

1
2
3
4

Unit Manager Sapp as alleged in the petition.[65]  Although Sapp has testified under oath that he did not make these statements, at least one former NSDC detainee is willing to testify that he did and that these statements were heard by many.[66]

5
6

## C.    Respondent has acted and continues to act with deliberate indifference to Petitioners' safety.

7
8
9
10
11
12
13
14
15
16
17

The Due Process Clause of the Fifth Amendment forbids the government from depriving a person of life, liberty, or property without due process of law.[67] Pretrial detainees have a Constitutional right to be free from punishment prior to conviction,[68] which includes a right to reasonable safety and medical care.[69]  A prison official violates these rights when he acts with "deliberate indifference" to detainees' safety or serious medical needs.[70]  Unlike convicted prisoners, whose claims arise under the Eighth Amendment, and therefore require a showing of both subjective and objective deliberate indifference, pretrial detainees need only show "objective recklessness" by jail officials.[71]  "Objective recklessness" means that the jail official "did not take reasonable available measures to abate [a substantial risk of harm facing petitioners], even though a reasonable officer in

18
19
20
21
22

[65] *Id.* at 37–38.

[66] Exhibit C at ¶¶ 5–7.  Notably, Mr. Nagel has not wavered on what he heard since filing his complaint in *Nagel v. Core Civic, et al.*, 2:20-cv-1279-GMN-DJA, which he bravely filed pro se in early July while still incarcerated at NSDC. Notably, Nagel's complaint is specific, detailed, and consistent, making his allegations credible.

23

[67] U.S. Const. amend. V.

24

[68] *See Bell v. Wolfish*, 441 U.S. 520, 99 (1979) ("holding that, under Due Process Clause, a detainee may not be punished prior conviction").

25

[69] *Gordon v County of Orange*, 888 F.3d 118, 1124–25 (9th Cir. 2018).

26

[70] *Id.*; *Castro v. Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc).

[71] *Castro*, 833 F.3d at 1071.

13

1    the circumstances would have appreciated the high degree of risk involved—
2    making the consequences of the [the jail official's] conduct obvious."[72]

3        Although Respondent has enacted some measures to combat COVID-19
4    and has not completely ignored the pandemic, that does not preclude a finding of
5    deliberate indifference.  Respondent claims that its policies are consistent with
6    CDC guidance but, as explained above, that is not the case with at least the ten-
7    day quarantine period for newly arriving detainees; extremely punitive
8    treatment that newly arriving detainees and COVID-19 suspected or confirmed
9    positive individuals receive; and the lack of testing for even symptomatic
10   individuals or those who have had close contact with suspected or confirmed
11   positive individuals.  This inadequate testing, inadequate quarantining/isolating,
12   and punitive treatment continues to create a dangerous and overly punitive
13   environment for all at NSDC, including Petitioners, as the steady stream of
14   cases—and the recent influx of cases—shows.

15       As Judge Bernal of the Central District of California recently wrote in
16   granting an injunction requiring a jail to comply with CDC guidelines, "[i]t is not
17   enough for Defendants to nominally comply with some portions of the [CDC]
18   Guidelines so that they can claim 'we are testing' and 'we are providing soap'—
19   they must fully and consistently comply so that the compliance is an effective tool
20   to abate the spread of [COVID-19] infection."[73]   Respondent should not be able to
21   escape Court intervention merely by pointing out that it has implemented some
22   of the CDC's recommended policies while completely ignoring others.

23

24

25       [72] *Id.*

26       [73] *Ahlman v. Barnes*, 445 F. Supp. 3d 671, 691 (C.D. Cal. 2020).

14

**Conclusion**

Petitioners are not after money.  They merely want constitutionally sufficient conditions of confinement to reduce their risk of exposure to COVID-19 and, by extension, to reduce the risk for others so that the virus does not run rampant through the NSDC.  This Court should find that Petitioners have shown deliberate indifference based on the information contained in the petition and this reply or, at the very least, grant the requested interim judicial fact finding and/or schedule an evidentiary hearing.

Dated: October 1, 2020

Rene L. Valladares
Federal Public Defender

*/s/ Erin Gettel*
By_____

Erin Gettel
Assistant Federal Public Defender

1

## <u>CERTIFICATE OF ELECTRONIC SERVICE</u>

2

The undersigned hereby certifies that he is an employee of the Federal Public

3

Defender for the District of Nevada and is a person of such age and discretion as to

4

be competent to serve papers.

5

That on October 1, 2020, he served an electronic copy of the above and

6

foregoing Reply to response (ECF No. 13) to Petition (ECF No. 1) by electronic service

7

(ECF) to the person named below:

8

9

      NICHOLAS A. TRUTANICH
      United States Attorney

10

      HOLLY A. VANCE
      Assistant United States Attorney

11

      501 Las Vegas Blvd. South
      Suite 1100

12

      Las Vegas, NV 89101

13

                    */s/ Brandon Thomas*

14

                     Employee of the Federal Public
                     Defender

15

16

17

18

19

20

21

22

23

24

25

26

27